## Norfolk
## BURT JOHN HANSON
v.
## COMMONWEALTH OF VIRGINIA
No. 1543-89-1
Decided March 24, 1992

174

COUNSEL

William E. Buyrn (Buyrn & Buyrn, on brief), for appellant.

Janet F. Rosser, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLEMAN, J.**—Burt John Hanson was convicted by a jury of the murder of William Rodney Taylor, the use of a firearm in the commission of Taylor's murder, and grand larceny. He makes four assignments of error. He claims the trial court improperly admitted into evidence: two photographs of Taylor's body; three postmarked envelopes, on which his fingerprints were found, that were seized from a bag of trash in Taylor's mobile home; and testimony from two witnesses who recounted unfavorable statements that the victim, Taylor, had made about Hanson. Hanson also claims the evidence of the value of the stolen property was insufficient to support the grand larceny conviction. We conclude that the trial

court erred by allowing into evidence the statement of the murder victim, Taylor, regarding his dissatisfaction with Hanson. The statement was not admissible regardless of whether it was admitted, as the court ruled, to prove the victim's state of mind, or to prove the truth of facts asserted in the statement. Neither fact was relevant to prove a material issue in the case. We conclude, however, that the admission of the testimony was harmless error. The testimony had little, if any, tendency to prejudice the jury against Hanson because it was so inconsequential when viewed in comparison to the overwhelming evidence of Hanson's guilt in relation to his incredible account of the events. We find no other error; therefore, we affirm the convictions.

William Taylor was found dead in his mobile home in the city of Chesapeake on October 14, 1987. The police had come to the mobile home at the request of George Coldwell and Betty Williams, Taylor's friends, who had been trying to contact him for three days. When the police discovered Taylor's body, he had been dead for over seventy-two hours. His body was found in bed covered by a pillow and sheet. When the police removed the bed covers, they found Taylor's body clothed in only an adult plastic diaper with his arms handcuffed to opposite corners of the bed and one foot tied to the bottom corner of the bed with a rope. Taylor's head was covered by a plastic trash bag, which was fastened around his neck with a black plastic strap. The police removed the plastic bag and found that Taylor had been blindfolded with duct tape and had been shot at close range through the blindfold below his left eye. Because no holes were found in the plastic bag, the police concluded it had been placed over Taylor's head after he had been shot.

Taylor's mobile home was in disarray. Taylor's sister, Katherine Lassiter, was called to the scene the next day. She described the home as "wiped out," indicating that most of Taylor's possessions, including an answering machine, televisions, VCR's, a stereo, clothing, linens, and toilet articles, had been taken. Taylor's jewelry, which he always wore, was missing, and most of the tools he owned as part of his business had been taken from his tool shed. Sharon Ange, Taylor's other sister, was also called to the crime scene. She confirmed that most of Taylor's belongings were gone.

The police found a bag of trash inside the mobile home by the front door. Near the top of the bag were letters and their corre-

sponding envelopes addressed to businesses located near Taylor's mobile home. The mail to these businesses had been stolen and checks had been removed from the envelopes. The envelopes were admitted into evidence because Hanson's fingerprints were on each of them. In the trash bag beneath the letters and envelopes, the police found adult plastic diapers and items similar to those used to bind Taylor's body, including a black plastic strap and rope identical to that found binding Taylor's ankle.

Hanson, who was using the name of Simon Davis at the time, had been Taylor's roommate since April 1987. The two had begun, in the early summer of 1987, a woodcraft and upholstery business, which they operated out of a flea market run by Taylor's close friend, Betty Williams. Over Hanson's objection, Williams testified that Taylor had told her many times during the few weeks before Taylor's murder that Hanson was not contributing to his share of the living expenses and that he wanted Hanson to move out. Katherine Lassiter testified that Taylor had made similar statements to her in the latter part of August.

Betty Williams and George Coldwell testified that the last time they saw Taylor, he was working in his shop at the flea market on Saturday, October 10, 1987, when he received a phone call which left him visibly upset. Unable to concentrate, Taylor left work early. When Taylor failed to appear for work the following day, Williams called his mobile home that morning. Hanson answered the call and told Williams that Taylor would either call her or come to the shop later. Immediately after Williams' call, George Coldwell, who also worked at the flea market, called Taylor's number. Again, Hanson answered the phone. Hanson told Coldwell that Taylor had gone to an auction with a friend and that Taylor had been having car trouble. Coldwell was suspicious because no auctions were held on Sundays and because Taylor was habitually very particular with his car. Whenever he had a problem, Taylor would call Coldwell to fix his car. Williams and Coldwell tried for the next three days to reach Taylor by phone; they eventually called the police on Wednesday evening, after going to his mobile home and finding his dogs running loose in his yard.

Taylor's car was found abandoned in a parking lot in Henrico County on November 6, 1987. The keys had been left in the ignition, and the license plates had been removed. An empty en-

velope, which carried Hanson's fingerprint, was recovered from the glove compartment.

During the week of October 18, 1987, Hanson appeared at the Salmon Lodge, a commune in Cherryfield, Maine, in a fully loaded station wagon. Heather Buck had arrived there at about the same time. She and Hanson, who had met at the commune several years before, began a relationship which lasted seven months. Buck testified that when Hanson arrived at the commune, his station wagon was haphazardly loaded with clothes, tools, sheets, towels, a stereo, a television, and a handmade afghan, among other things. The items were either loose in the car or thrown into plastic trash bags. Buck, who helped Hanson unpack a few days after his arrival, stated that some of the clothes were too large for Hanson. When making his bed, she also found a gun between his mattresses. She stated that he usually kept the gun under his pillow at night and that he eventually sold it to an acquaintance after removing the serial number. The gun, which was traced to Taylor, was conclusively identified through ballistics as the murder weapon.

Buck also found among Hanson's belongings items of jewelry and watches. Those that were recovered and presented into evidence were all identified by multiple witnesses as having belonged to Taylor. Buck's description of other pieces of jewelry which Hanson had that were not recovered matched descriptions of Taylor's missing jewelry. Buck testified that Hanson had given her varying explanations as to why he had come to Maine, how he ended up with the jewelry, and why he carried a gun. Initially, he said he left his stripper girlfriend behind because she was sleeping with someone else. Then, he said two men had shot at him because of an argument involving drugs, that they had fired at his car as well, and that was the reason he traded it. He later added that he had shot back and was afraid he might have killed one. Hanson told her he had purchased the jewelry as an investment with money he had made from a drug deal. He gave Buck a gold necklace and a gold bracelet for Valentine's Day, and on another occasion, he gave her a gold nugget chain and a diamond cluster ring. These items were recovered by the police and identified at trial as Taylor's. Hanson pawned most of the rings and gave the watches away, in one instance, as repayment for drugs.

Hanson and Buck moved several times. They were eventually apprehended in Pittsfield, New Hampshire. When arrested, Hanson said he was Peter Cooper. After the arrest, Buck turned over to the police the jewelry Hanson had given her, an answering machine, and woodworking equipment which Hanson had with him when he arrived at the commune. All these items belonged to Taylor. Hanson told Buck when arrested that he had never been to Virginia, even though he had a Virginia inspection sticker on his car. After finally admitting to her that he had been in Virginia, he said he had never known Taylor. Eventually, he told her that Taylor had rented a room from him in a mobile home that he owned. He consistently denied that he had murdered Taylor.

Hanson testified on his own behalf. He stated that he had no motive to murder Taylor and that their relationship had been good. On direct examination, he gave a detailed account of his whereabouts on the weekend of Taylor's murder. He stated that he had begun to pack his belongings on Friday afternoon, October 9. He had just received a large payment on his workers' compensation claim and was leaving for New England that weekend. In fact, Hanson had received a lump sum payment several weeks earlier and had been receiving biweekly benefit payments. Taylor, who knew Hanson was moving to New England, was to help him purchase a car that weekend for his trip, but had to change his plans and work that Saturday.

Hanson testified that he went to several bars in Norfolk that Friday night to celebrate receipt of his money and to say good-bye to some friends. He encountered an acquaintance, Bob McCrary, who told Hanson he could get him some pain killers which Hanson was in the habit of taking for back pain. Hanson went to McCrary's house, where McCrary accused him of having a homosexual relationship with Taylor. McCrary was jealous and threatened Hanson with a gun. He would not allow Hanson to leave until the next morning, during which time he had forced Hanson to play Russian roulette. McCrary dropped Hanson off in downtown Norfolk on Saturday morning. Hanson stopped at several places in Norfolk before taking a cab back to Taylor's mobile home in Chesapeake. No one was home when Hanson arrived that morning. Hanson said he found Taylor's dogs outside in the yard, so he fed them. He also picked up trash in the yard, which in-

cluded some mail that he placed in a trash bag in the mobile home. He then took a shower, called a cab, and went back to the Norfolk bars. He called Taylor around 5:30 or 6:00 p.m. to discuss his help in buying the car. He stayed in Norfolk until about 10:30 or 11:00 p.m. Saturday, when he took a cab home.

No one was home when Hanson arrived at the mobile home and went to bed. He awoke to the voices of Taylor and McCrary arguing. He said he was scared, so he sneaked out of the mobile home unnoticed. He heard what sounded like a car backfire, so he went back. He looked in the mobile home window and saw the two men arguing and heard Taylor plead for help. He did not call the police. He walked around for a short while and returned at daylight to find Taylor dead. He said he left immediately without calling the police because he was afraid he would be implicated when the police discovered he was using an alias. For reasons he could not explain, he found Taylor's car already fully packed, so he took Taylor's car keys and drove away.

On cross-examination, his story changed. Hanson said that when he returned to the trailer and peered in the window, he saw McCrary dressed in women's clothing and sitting on top of Taylor, at which time he heard another gunshot. He thought McCrary had fired at him, so he fled. He also said that when he came back to the mobile home and found Taylor dead, he spent some time there, rather than leaving immediately. He said he loosened Taylor's feet and covered him with a sheet. He insisted that he did not remove the rope from Taylor's feet, however, and could not explain why one of Taylor's feet had no rope around it and why a piece of rope was found at the bottom of the trash bag which contained the envelopes with his fingerprints.

On the second day of cross-examination, after Hanson had been allowed to review a statement he had made to the police several months earlier, he again changed his account. He said that when he called Taylor from Norfolk on Saturday evening, Taylor told him he was going to get someone to help him pack the car, so when they purchased a car for Hanson, they could transfer Hanson's belongings and he would not have to drive as far without a proper license plate.

When asked to explain about the jewelry which other witnesses identified as Taylor's, he stated that he had purchased the items in

Norfolk or that they had been given to him. He said that ten years earlier, his mother had given him the gold nugget necklace which was recovered from Heather Buck. The matching gold nugget ring, which was not admitted into evidence but which Buck said was one of the items he had arrived with, was purchased, Hanson said, in a pawn shop in Norfolk. Hanson later contradicted himself by saying Taylor gave him the gold nugget ring. When asked to explain how Heather Buck happened to find the murder weapon among his things, he simply said he did not know how it got there and suggested that perhaps the person who had packed the car had thrown it in there in order to implicate him.

On cross-examination, when Hanson was asked to explain why Taylor's car was found abandoned in a secluded spot in Henrico County with the license plates removed, he said he started to have car trouble, so he made it to a mall parking lot. From there, he called people listed in newspaper ads to meet him so that he could purchase another car. He said he purchased another car with money and by trading Taylor's car with some of the items in it. When questioned about some of Taylor's possessions which were recovered in New Hampshire, Hanson said that the woodworking equipment purchased by Taylor belonged to him (Hanson) due to the business relationship they had established, that Taylor had given him the answering machine because it was broken, that Taylor had given him the beta VCR and movies because he was planning to buy another VCR, and that he just happened to own a black onyx ring exactly like Taylor's. He denied Buck's testimony that he arrived in Maine with a fake Rolex watch, or a calculator watch, and that he ever gave or traded them away. He maintained his story, even though the watches had been recovered, were in evidence, and were repeatedly identified as Taylor's. Hanson said Heather Buck was trying to frame him. Katherine Lassiter identified the afghan as one that Taylor had made. Hanson had told Buck that an old girlfriend made it for him.

## EVIDENTIARY ISSUES

### I. *Photographs*

Hanson claims that photographs admitted as exhibits 11 and 12 were prejudicial because of their gruesome nature and because the corpus delicti had been already shown by other pictures admitted into evidence. The Commonwealth offered photographs which se-

quentially depicted the crime scene as the police discovered it. The first photograph, exhibit 8, showed Taylor's body as it was found, with his head covered by a pillow and the rest of his body covered by a sheet. The next picture, exhibit 9, revealed Taylor without the pillow and sheet and showed the plastic bag over his head secured by the plastic strap. Hanson did not challenge the admissibility of these photographs. He insisted, however, they were sufficient to prove the *corpus delicti*. Exhibit 11 showed Taylor's body after the plastic bag had been removed from his head, and exhibit 12 showed the body after the duct tape blindfold had been removed. The Commonwealth contends that all these pictures were admissible because they portrayed how the murder was perpetrated. We agree.

■ The admission into evidence of photographs of the body of a murder victim is left to the sound discretion of the trial court and will be disturbed only upon a showing of a clear abuse of discretion. *Williams v. Commonwealth*, 234 Va. 168, 177, 360 S.E.2d 361, 367 (1987), *cert. denied*, 484 U.S. 1020 (1988). A graphic photograph is admissible so long as it is relevant and accurately portrays the scene of the crime. *Washington v. Commonwealth*, 228 Va. 535, 551, 323 S.E.2d 577, 588 (1984), *cert. denied*, 471 U.S. 1111 (1985). The jury was entitled to consider how the killing was accomplished, as well as the details, circumstances and nature of the killing. The pictures accurately depicted these matters and were, therefore, relevant and probative. The trial court did not abuse its discretion by admitting the photographs into evidence, and we will not disturb its decision to admit them.

## II. *Postmarked envelopes*

Hanson contends that the trial court erred by admitting into evidence the postmarked envelopes recovered from Taylor's trash which bore Hanson's fingerprints. He claims the postmark on the envelopes violated the hearsay rule because with them the Commonwealth sought to show that they had been mailed on a certain date and, therefore, Hanson was at the scene of the crime on either October 10 or October 11. The Commonwealth acknowledged that, in addition to using the fingerprints to prove that Hanson had been at the murder scene, it sought to use the postmark to prove that Hanson stole the mail on either October 10 or October 11. Furthermore, the Commonwealth contends that by showing that checks were removed from the mail, the evidence

supports the inference that Hanson's purpose was to obtain money to facilitate his escape. Hanson objected on the ground that the postmark was used to prove the date the mail was taken and was hearsay. Further, he argued that the evidence of mail theft was irrelevant and prejudicial.

We hold that the trial court did not err by admitting the postmarked envelopes which bore Hanson's fingerprints. The envelopes were independently relevant and admissible as a circumstance to show Hanson's presence, despite any hearsay information they might have contained. The police found the envelopes at the top of a trash bag placed by the door of Taylor's mobile home. Buried within the bag were items identical to those which had been used to bind Taylor's body, including a black strap and a piece of rope. The envelopes carried Hanson's fingerprints, which the police used to identify him, since he was only known to people in Virginia as Simon Davis.

> [I]t is a time-honored principle of evidence law that, in general, if evidence is admissible for *any* purpose, it is admissible. . . . Absent extreme prejudice, a party should not be precluded from offering probative evidence on a material issue merely because the evidence would be inadmissible if offered for some other purpose.

C. Friend, *The Law of Evidence in Virginia* § 225 (3d ed. 1988). The envelopes were relevant to prove Hanson's identity and presence at the murder scene. Moreover, the envelopes bearing his prints were highly probative in showing his participation in the murder. The fact that the envelopes were found atop items in the trash which also contained items similar to those used to bind Taylor was a circumstance that the fact finder could consider in deciding that the person who placed the envelope in the trash did so after Taylor was bound and, therefore, was a person who would have known of or participated in Taylor's murder.

Generally, evidence admissible for one purpose, but inadmissible for another, should be accompanied by a limiting instruction to the jury. *Id.* Thus, even though the envelopes were admissible on the foregoing grounds, the trial court should have instructed the jury to disregard the postmark, if Hanson's objection was well taken. We hold that no limiting instruction was necessary because of the nature of the hearsay problem that accom-

panies postmarks. "[T]he basis for excluding hearsay is that it is not subject to the tests which ordinarily exist to ascertain the testimony's truth." *Penny v. Commonwealth*, 6 Va. App. 494, 498, 370 S.E.2d 314, 317 (1988). When the hearsay in question is an official United States postmark, those concerns are not present.

We are presented with a novel question in Virginia, which has been addressed by other jurisdictions through case decisions or rules of evidence. The issue is whether a postmark is inadmissible as hearsay to prove the date on which it was affixed. "The postmark on an envelope is . . . admissible to show that the envelope bearing it has passed through the hands of the postal officials at the time and place indicated." 1A Wigmore, *Evidence* § 151 (Tillers rev. 1983). Because the inherent trustworthiness and reliability of a postmark has been universally recognized, the concern becomes whether a procedural, mechanical method for its admission has been followed. Other courts have considered a postmark to be "reliable hearsay" and have allowed its admission under a "residual hearsay exception" comparable to Rule 803(24) of the Federal Rules of Evidence.

In *Ward v. State*, 770 S.W.2d 109 (Ark. 1989), the Supreme Court of Arkansas explained that hearsay would be allowed under its residual exception if it had "circumstantial guarantees of trustworthiness equivalent to those supporting common law exceptions," and that the exception would be used "very rarely, and only in exceptional circumstances." *Id.* at 111. The court explained, "A good example . . . is where a postmark, which is reliable hearsay, is offered to prove that a letter was mailed from the city shown on the postmark." *Id.* In *United States v. Cowley*, 720 F.2d 1037 (9th Cir. 1983), *cert. denied*, 465 U.S. 1029 (1984), decided under the Federal Rules of Evidence, the prosecution sought to introduce evidence of a postmark on a letter to prove the letter was mailed from a certain city. The court held that the postmark fell within the definition of hearsay, but,

[u]nlike most hearsay, however, the postmark is very reliable; there is little risk of misperception or fabrication on the part of the postal official. Even though it does not easily fit into any of the enumerated hearsay exceptions . . . the postmark's circumstantial guarantees of trustworthiness make it a perfect candidate for Fed. R. Evid. 803(24), the so-called

"expanding exception."

*Id.* at 1044-45; *see also* 7 J. Wigmore, *Evidence* § 2152 (Chadbourn Rev. 1978).

■ We have not adopted, as have many states, a set of rules of evidence. In fact, an attempted codification of our rules of evidence has been rejected. However, reference to the Federal Rules of Evidence and decisions of other jurisdictions which have adopted rules that have supported their holding that a postmark is admissible as a hearsay exception provide the rationale for a comparable rule in Virginia. We hold that, although a postmark is within the traditional definition of hearsay, it is admissible as an exception to the hearsay rule when used to prove the date on which the postal service affixed its postmark in the regular course of business. The evidence of the postmark is admissible to prove the date on which the postmark was affixed without having the testimony of the agent who affixed the postmark or without an agent to verify how such marks are affixed in the normal course of business by the postal service.

Additionally, to the extent that the postmark on the envelope on which Hanson's fingerprints were found was hearsay evidence which the jury could consider as tending to establish the dates on which Hanson was at Taylor's mobile home, the testimony of Betty Williams and George Coldwell that Hanson answered the phone at Taylor's residence on October 11, and Hanson's admission that he was there on that day, was direct evidence which established the same fact that the postmark tended to establish circumstantiality.

III. *Evidence that Mail and Checks Stolen*

■ The trial court held the fact that the mail, which included checks, was taken from the nearby businesses was relevant evidence to prove that Hanson used this as a method and scheme to flee the jurisdiction and avoid apprehension. We affirm the ruling. The fact that Hanson may have resorted to illegal means to obtain funds to effect his escape or to avoid apprehension is relevant to show a consciousness of guilt; the value of such evidence in proving guilt is greater than any tendency to influence improperly the jury. "Other crimes evidence which tends to prove the defendant's knowledge has been permitted . . . where the offenses were inter-

related so that evidence of one tend[s] to show the defendant's guilty knowledge of the other." *Meadows v. Commonwealth*, 9 Va. App. 243, 246, 385 S.E.2d 906, 907-08 (1989).

In this instance, the mail was found at the top of a trash bag which contained incriminating items, and Hanson's fingerprints were on the mail. This evidence tended to place Hanson at the scene at the proper time. The evidence had substantial probative value aside from showing that the mail taken was a means of obtaining funds to evade apprehension. However, proof of this fact also tended to explain Hanson's motive for taking the mail and why his fingerprint was on it. The motive for taking the mail explains an otherwise senseless act. The trial court determined that the probative value of the evidence outweighed any prejudice to the accused. "This responsibility is a matter submitted to the sound discretion of the trial court, and will not be disturbed on appeal absent a clear abuse of discretion." *Wise v. Commonwealth*, 6 Va. App. 178, 188, 367 S.E.2d 197, 203 (1988). We find no abuse of discretion.

## IV. *Victim's Hearsay Statements*

Hanson's final assignment of error is that the trial court should not have permitted Betty Williams and Katherine Lassiter to testify that, in the weeks and months preceding Taylor's murder, he had told each of them on several occasions that he was dissatisfied with his living arrangement because Hanson was not contributing his share to the household expenses, and that he was going to ask Hanson to move out. The court ruled that the statements were not hearsay because they were not offered for their truth, but rather, were offered to show the state of mind of the victim. Consequently, the court admitted the statements and instructed the jury as to Lassiter's testimony that it was not to consider her statements as evidence that Hanson owed Taylor a debt or that Hanson had not paid his expenses.[1] The court ruled that the statements were not hearsay; they were admitted to show Taylor's state of mind, not to prove that Hanson had not paid his expenses.

---

[1] The court did not, when Betty Williams subsequently testified, instruct the jury not to consider her statement as evidence to prove that Hanson owed Taylor a debt or had not paid his expenses, nor did defense counsel request a limiting instruction after the trial court overruled his objection. Sharon Ange subsequently gave similar testimony, to which Hanson did not object.

We hold that the trial court erred by admitting the evidence. Whether the evidence was offered to prove that Hanson was not paying his share of expenses, or to prove Taylor's state of mind toward Hanson, the evidence should not have been admitted on either theory. Proof of either fact did not support the inference of a motive for Hanson to have killed Taylor. Thus, the evidence should have been excluded as hearsay because, on the grounds the trial court admitted the evidence, it had no relevance.

■ Whether an extrajudicial statement is hearsay depends upon the purpose for which it is offered and received into evidence. If the statement is received to prove the truth of its content, then it is hearsay and, in order to be admissible, must come within one of the many established exceptions to the general prohibition against admitting hearsay. *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 197, 361 S.E.2d 436, 441 (1987) (citing C. Friend, *The Law of Evidence in Virginia* §§ 224 and 230 *et seq.* (2d ed. 1983)).

■ If, however, the statement is admitted to prove some other extraneous fact, such as that the statement was in fact made, the state of mind of the declarant, or notice or knowledge, then the statement is not hearsay and will be admissible if relevant and not otherwise violative of another rule of evidence. *Id.* When evidence that might otherwise be hearsay is admitted for a limited, non-hearsay purpose, the trial court must instruct the jury that they are to consider the evidence for the specific limited purpose; where such a limiting instruction is given, we presume that the jury followed that instruction. *LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), *cert. denied*, 464 U.S. 1063 (1984).

Here, the trial court attempted to restrict the use which the jury could make of the statements which Taylor made to Williams and Lassiter, by telling the jury that they could not consider the statements for the fact that Hanson had not paid Taylor his share of living expenses; rather, the trial court instructed the jury they "should consider it only for what weight you feel it deserves." While we must assume that the jury abided a proper limiting instruction, telling the jury not to consider the statement as proof that Hanson was not paying any money but allowing the jury to give the statement "what weight you feel it deserves" did not prevent the jury from considering the evidence for an improper purpose. The court ruled, although it did not so inform the jury, that

the evidence was admissible for a non-hearsay purpose of proving Taylor's state of mind. We find that Taylor's state of mind was not relevant because it had not been communicated to Hanson. *See Hardy v. Commonwealth*, 110 Va. 910, 924, 67 S.E. 522, 528 (1910). No evidence shows that Taylor communicated to Hanson his complaint about sharing expenses, nor are the circumstances such that it is permissible to infer that he had done so. Even so, it is Hanson's state of mind, or whether Hanson had a motive, with which we are concerned, not Taylor's. Thus, even if the declarations established Taylor's state of mind, that fact is not relevant because, without evidence permitting the inference that Taylor's state of mind was communicated to Hanson, Taylor's statements were not relevant and did not establish a motive for Hanson to have killed Taylor.

█ The state of mind of a homicide victim is relevant and material only in cases where the defense contends that the death was the result of suicide, accident, or self-defense. *Evans-Smith*, 5 Va. App. at 198, 361 S.E.2d at 442; *West v. Commonwealth*, 12 Va. App. 906, 910, 407 S.E.2d 22, 24 (1991).[2] In those instances, the state of mind must have been communicated to the accused. When those defenses are not in issue, and when the accused has not been made aware of the victim's state of mind, the statement would become relevant only through "a circuitous series of inferences." *United States v. Brown*, 490 F.2d 758, 771 (D.C. Cir. 1973).

In Hanson's case, Taylor's state of mind would have had significance only if the fact finder inferred that Taylor acted upon his state of mind by communicating his dissatisfaction to Hanson and that Hanson responded by killing Taylor. Such "a circuitous series of inferences" is not logically permissible. For the fact finder to infer that Taylor confronted Hanson the day Taylor left the flea market, and that Hanson was so incensed that he responded by killing Taylor, is too remote and tenuous, especially given the nature of Taylor's statements.

█ For the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which

---

[2] In both *Evans-Smith* and *West*, the statements of the victim were offered for their truth and were therefore, without question, hearsay. *See also Kauffmann v. Commonwealth*, 8 Va. App. 400, 406-07, 382 S.E.2d 279, 282-83 (1989).

inferentially implicates the accused, such as by showing "previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant." *Brown*, 490 F.2d at 765-66. The testimony of Williams and Lassiter included no expressions of fear by Taylor, no indications that Hanson was known to be violent, and no threats and no turbulent relationship between the two men. The court in *Brown* stated that while statements regarding past threats, fear, and incidents of violence

> are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, it is generally agreed that their admissibility must be determined by a careful balancing of their probative value against their prejudicial effect. . . .The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on defendant's state of mind rather than the victim's—*i.e.*, as a true indication of defendant's intentions, actions, or culpability.

*Id.* at 766 (footnotes omitted). Here, where the statements merely established Taylor's dissatisfaction with Hanson's not paying his expenses, and did not import a sense of impending fear, or relate something Hanson said to the victim, the evidence has little probative value, and the "principal danger" is greater because it requires an even greater leap of reasoning on the part of the fact finder for the evidence to have any significance.

Thus, whether the statements of Williams and Lassiter were considered as hearsay to prove that Hanson was not paying expenses, or for the non-hearsay purpose of showing Taylor's state of mind, both were improper because the fact they proved did support the inference which the jury was asked to draw.

## HARMLESS ERROR

A criminal conviction shall not be reversed for an error committed at trial when "it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678; *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc). Trial error is presumed to be prejudicial and "a fair trial on the merits and sub-

stantial justice are not achieved if an error at trial has affected the verdict." *Id.* We must reverse a criminal conviction "unless 'it plainly appears from the record and the evidence given at the trial that' the error did not affect the verdict." *Id.* An error does not affect the verdict if we can determine, "without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." *Id.*

We conclude that the admission of Taylor's statements to Williams and Lassiter expressing his displeasure with Hanson's not paying his share of the living expenses did not affect the verdict. The improper evidence was harmless, when viewed in light of the overwhelming evidence that Hanson murdered Taylor. Uncontradicted evidence implicated Hanson in Taylor's murder. Hanson was at Taylor's home when Taylor's friends had become concerned that Taylor had failed to report to work. Hanson reported that Taylor was at home and would report or call in soon, although Hanson's account of events was uncharacteristic of Taylor. Hanson's fingerprints were on envelopes which had been placed at the crime scene after other items similar to those used in Taylor's murder had been discarded; Hanson possessed the murder weapon; and he possessed Taylor's car and numerous other items of personal property. Hanson offered no credible explanation for his possession of numerous items of Taylor's property; he gave conflicting explanations for his possession of this property.

Hanson denied involvement in the murder. He accused Bob McCrary of the crime. Although present at trial, McCrary did not testify. When the police first heard Hanson's accusation of McCrary, they checked the fingerprints obtained at the crime scene to determine whether any matched McCrary's. None did. Hanson's testimony was not credible. He lied to Williams and Coldwell when they telephoned to inquire about Taylor. He lied to Heather Buck. Throughout his pretrial confinement, he changed his version of events to conform to the evidence against him as it became known. In addition to those factual discrepancies, we have the testimony of a man who claims he woke up in his mobile home, heard argumentative voices of his roommate and another man he knew, became frightened, sneaked out of the mobile home unnoticed, returned when he heard what sounded like a car backfire, looked in the window of the home where he saw the two men arguing and heard his roommate plead for help, left without call-

ing the police, walked around, returned at daylight to find his roommate dead, did not call the police, and immediately left the area. His account of the events is inherently unbelievable. The statements of Taylor to Williams and Lassiter about Hanson, while they should have been excluded, were inconsequential in light of the evidence which overwhelmingly points to Hanson as Taylor's murderer.

## GRAND LARCENY

Finally, Hanson contends the evidence was insufficient to prove that he had committed grand larceny, claiming that the value of the property taken was not proven to be of $200 or more as required by Code § 18.2-95. This argument has no merit. The record contains evidence that the value of the stolen jewelry, standing alone, was in excess of $200. Gladys Mizelle, who purchased some of Taylor's rings for him, testified to their purchase price. Although those specific rings were not recovered and admitted in evidence, Heather Buck testified that Hanson had pawned those rings. Those were but a few of the numerous items of jewelry which Hanson stole, in addition to Taylor's automobile and pistol. Viewed in the light most favorable to the Commonwealth, *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975), and considered in conjunction with all the other evidence against Hanson, the evidence proves that the value of the items exceeded $200 and supports his conviction for grand larceny.

For the foregoing reasons, the judgment of the trial court of the City of Chesapeake is affirmed.

*Affirmed.*

Barrow, J., and Moon, J., concurred.