COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Coleman and Lemons
Argued at Salem, Virginia


BENJAMIN SCOT ELLIOT, S/K/A
 BENJAMIN SCOT ELLIOTT
                                              OPINION BY
v.   Record No. 0995-98-3          JUDGE DONALD W. LEMONS
                                            AUGUST 10, 1999
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF GILES COUNTY
                    Colin R. Gibb, Judge

        Max Jenkins (Jenkins & Jenkins, on brief),
        for appellant.

        Daniel J. Munroe, Assistant Attorney General
        (Mark L. Earley, Attorney General, on brief),
        for appellee.


     Benjamin Scot Elliott appeals his conviction by a jury of

second degree murder and use of a firearm in the commission of

murder.  On appeal, he contends that the evidence was

insufficient to support his convictions and that the trial

court's admission of hearsay evidence was reversible error.  We

disagree and affirm the convictions.

                      I.   BACKGROUND

     On the afternoon of February 19, 1997 Elliott loaned his

car to his girlfriend, Misty Dawn Dellinger, the victim.  She

was to have returned the car to Elliott by 6:30 that evening

after running errands; however, she did not return until almost

7:30 p.m. after spending the afternoon with her lesbian lover,

Sarah Jackson.  Elliott was aware of the relationship between Dellinger and Jackson and had expressed animosity towards Jackson.

Scott Minnock visited Elliott's residence at approximately 5:45 p.m. on the day of the murder.  When Dellinger had not returned on time, Elliott repeatedly told Minnock that Dellinger was late.  Minnock observed Elliott putting a shoulder holster on and off during this time.  He also saw Elliott manipulating a pistol inside the holster and repeatedly drawing the weapon.  When Dellinger arrived at the residence late, Minnock heard her tell Elliott that she had been with Jackson that afternoon.

Dellinger initially sat in the living room with Minnock but went into one of the back bedrooms alone with Elliott.  She and Elliott returned to the living room.  Dellinger sat in a chair and Elliott stood over her.  Minnock remained seated watching television.  Minnock stated that he "heard the gun go off," looked up and saw Elliott holding a gun "pointed over towards [Dellinger's] direction" a few feet from the victim.

Dellinger had fallen "onto the back of the couch."  The Deputy Chief Medical Examiner testified that she died as a result of a .44 caliber bullet which had entered her body through the chin in a "sharply downward" direction, proceeded into the chest, penetrated the thoracic aorta, and then penetrated and lodged in the liver.  The path of the bullet was "downward at a sharp angle, and backward."

Elliott maintained that the shooting was an accident and offered the following explanation to Giles County Sheriff's Investigator E.M. Blevins:

> I loaded the damn pistol like an idiot and I got in there and I tried the holster. I kept trying to put the holster on. I don't know how to wear it. I kept getting it on wrong, the snap was underneath and everything and trying to unsnap it and, you know, I was playing with it and pulling it out. Well, I finally, I don't know if I ever got it on right or not, but I tried it three or four different ways and I jerked the pistol out and when I did, when I jerked it forward, I don't know if the shoulder, the, the holster jerked it, I don't know what happened, but the damn gun went off.

Elliott claims he "didn't pull the trigger back" and stated that the last word uttered by the victim before she was shot was "no."

Richard Roberts, a firearms expert for the Division of Forensic Science, stated that he examined the murder weapon. It is a single-action revolver and in order to fire such a weapon, "you have to cock [the hammer] back and then pull the trigger." Roberts explained that a safety feature of the weapon included a transfer bar that is engaged only when the trigger is pulled. If the trigger is not pulled, the transfer bar will not engage and the gun will not fire, even if the hammer is pulled back and released. Roberts said the gun was "in mechanical operating conditions with the safety features functioning properly." The trigger pull required "approximately four and one-half pounds"

of pressure which was within "normal factory recommendations" and considered "safe." Because "there was a question about the accidental shooting," Roberts performed tests "trying to see if [he] could get it to accidentally fire and . . . be sure the transfer bar was working properly." Roberts conceded that it was possible that the weapon could be cocked by catching it on the holster or clothing, but further testified that he examined the holster in question and found that the pistol went "in and out of the holster with no problem." Roberts testified, without objection, that he "could not get it to go off accidentally." He said that even if a person cocked the hammer back, the weapon would not fire "unless the trigger is pulled or pushed to the back real well."

Michael Waldron testified that a few months before the fatal shooting, Dellinger visited his house but declined to stay overnight and told Waldron that Elliott had threatened to kill her if she tried to leave him. Additionally, Sarah Jackson testified that she was with Dellinger on the day she was fatally shot and that she told Dellinger not to be late because Elliott would be "mad at her" and that Dellinger said "she wanted to get a job and to get a car and she wanted to leave [Elliott] and she wanted me and her to move away together."

## II. SUFFICIENCY OF THE EVIDENCE

Where the sufficiency of the evidence is an issue on appeal, an appellate court must view the evidence and all

reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth.  See Cheng v. Commonwealth, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990) (citations omitted).

To establish the crime of second-degree murder, "the defendant must be shown to have wilfully [sic] or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm."  Essex v. Commonwealth, 228 Va. 273, 280-81, 322 S.E.2d 216, 220 (1984).  Whether a shooting is intentional or accidental is "a matter peculiarly within the province of a jury to determine."  Compton v. Commonwealth, 219 Va. 716, 731, 250 S.E.2d 749, 758 (1979).  Every unlawful homicide is presumed to be murder in the second degree.  See Painter v. Commonwealth, 210 Va. 360, 364, 171 S.E.2d 166, 169 (1969).

Malice is the element that distinguishes murder from manslaughter.  See Essex, 228 Va. at 280, 322 S.E.2d at 219-20.  The trier of fact may infer malice from the deliberate use of a deadly weapon unless the evidence raises a reasonable doubt whether malice existed.  See Morris v. Commonwealth, 17 Va. App. 575, 578, 439 S.E.2d 867, 870 (1994).  Killing with malice but without premeditation and deliberation is murder in the second degree.  See Perricllia v. Commonwealth, 229 Va. 85, 91, 326 S.E.2d 679, 683 (1985).

The fact finder believed the Commonwealth's evidence, including its theory of the case, and rejected Elliott's

evidence that the shooting was accidental. "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Elliott was guilty of second degree murder and use of a firearm in the commission of murder.

### III. HEARSAY

Elliott maintains that the trial judge erred by admitting hearsay statements of Michael Waldron and Sarah Jackson into evidence. Hearsay is "primarily testimony which consists [of] a narration by one person of matters told him by another." Williams v. Morris, 200 Va. 413, 417, 105 S.E.2d 829, 832 (1958). However, "[i]f the declaration is offered solely to show that it was uttered, without regard to the truth or falsity of its content, the declaration is not excluded by the hearsay rule." Speller v. Commonwealth, 2 Va. App. 437, 446, 345 S.E.2d 542, 548 (1986) (citations omitted). Of course, hearsay evidence is admissible nonetheless if it falls within one of the recognized exceptions to the rule of exclusion.

One of the exceptions to the rule of exclusion of hearsay evidence is the "state-of-mind" exception. In order to be admissible, the evidence must be relevant, must refer to a

presently existing state of mind, and must have no obvious

indication of fabrication or contrivance. Charles E. Friend,

The Law of Evidence in Virginia § 18-16 (4th ed. 1993).

With regard to relevance of the declarations of a homicide

victim we have said,

> [t]he state of mind of a homicide victim is
> relevant and material only in cases where
> the defense contends that the death was the
> result of suicide, accident, or
> self-defense. In those instances, the state
> of mind must have been communicated to the
> accused.
>
> \*       \*       \*       \*       \*       \*       \*
>
> For the state of mind of the victim to
> be relevant to prove the state of mind of
> the accused, some nexus must exist which
> inferentially implicates the accused, such
> as by showing previous threats made by the
> defendant towards the victim, narrations of
> past incidents of violence on the part of
> the defendant or general verbalizations of
> fear of the defendant.

Hanson v. Commonwealth, 14 Va. App. 173, 188-89, 416 S.E.2d 14,

23 (1992) (citations omitted) (internal quotations omitted).

Elliott did not contend that Dellinger's death involved

self-defense or suicide; rather, he claimed her death was an

accident. The Commonwealth contended that it was murder.

Elliott testified that his relationship with Dellinger was

"fabulous." Elliott's state of mind was a critical issue in the

case.

The testimony of Michael Waldron that Dellinger told him

that Elliott had threatened to kill her if she tried to leave

him is admissible under the state of mind exception to the rule of exclusion.  In this instance the state of mind of the victim is relevant to prove the state of mind of the accused and the nature of their relationship.  It is devoid of any obvious indication of fabrication or contrivance and the nexus to the defendant is obvious -- it relates a conversation between the defendant and victim which demonstrated the nature of their relationship and provided a motive for murder.

The testimony of Sarah Jackson that she told Dellinger that "she should go home because she had to be home at six thirty . . . and she didn't need to be late, [Elliott] would get mad at her," followed by Dellinger's response "that she wanted to get a job and to get a car and she wanted to leave [Elliott] and she wanted me and her to move away together," is also admissible under the state of mind exception to the rule of exclusion. Jackson's recitation of what she said to Elliott is not offered for the truth of the matter stated; rather, it is offered to prove that her statement was made as a catalyst for Dellinger's response.  The relevance of Dellinger's response depends upon nexus to the defendant.  Dellinger's response establishes her state of mind, namely, her intention to leave Elliott.  The testimony of Michael Waldron proves Elliott's state of mind in response to Dellinger's intention to leave him.  The testimony of Sarah Jackson is corroborative in nature.  The nexus to the defendant is his prior threat to Dellinger relating to the

subject of any intent she may have to leave him.  Also, the evidence rebuts Elliott's characterization of the relationship as "fabulous" and provides a motive for murder.

VI.   CONCLUSION

Finding no error, we affirm Elliott's convictions.

<u>Affirmed</u>.