COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Millette
Argued at Alexandria, Virginia


MATTHEW JAMES PAHNO

                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 2308-06-4                       JUDGE ROBERT P. FRANK
                                                         APRIL 22, 2008
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                           Joanne F. Alper, Judge

              Peter D. Greenspun (Melinda L. VanLowe; Greenspun, Shapiro,
              Davis & Leary, P.C., on briefs), for appellant.

              Rosemary V. Bourne, Assistant Attorney General (Robert F.
              McDonnell, Attorney General, on brief), for appellee.


       Matthew James Pahno, appellant, was convicted, by a jury, of first-degree murder in

violation of Code § 18.2-32.  On appeal, he contends the trial court erred in:  1) admitting into

evidence a document found in appellant's jail cell; 2) refusing to admit into evidence appellant's

conversation with police immediately following the murder; and 3) instructing the jury that they

may consider evidence of appellant's character.  For the reasons stated, we affirm the conviction.

                                       BACKGROUND

       In July of 2005, appellant contacted his Uncle Peter because he was unhappy living with

his grandparents in South Carolina.  Peter made arrangements for appellant to stay temporarily

with appellant's Uncle Nick and Aunt Marissa in Arlington.  Although Nick was out of the

country, Marissa agreed to allow appellant to stay at their house.

       [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

On July 15, 2005 appellant killed Marissa in her home. After strangling her with a belt and decapitating her, he called 911 and told them he had just killed someone. Police arrived and took appellant into custody.

On the way to the police station while in the police car, appellant made several statements that were audiotaped and later transcribed. Appellant stated he was dreaming and described his uncle as "some kind of wizard." He said his aunt was a "devil woman" who had no respect for her marriage. He added, "[h]is face was in my aunt's face on the wall and then -- and then the next thing I knew, I was on the phone . . . I think my uncle can explain some of this." He also said his aunt's face was changing, and everything was "one color." Appellant also kept repeating the word "orange."

Two weeks before trial, corrections officers conducted a search of appellant's jail cell. A detective recovered a handwritten note containing the following:

MATT

> First: I was hearing voices, and I saw demons. The demons attacked me on the day this happened. Some where [sic] holding me down and the others was trying to make me drink out some [sic] bottle. It might have been poison. All together it was 5 demons.
>
> Second: One demon helped me strangle her and the others were floating around in circles. After I recieved [sic] help strangling my annie I herd [sic] 2 or 3 doors slam in my house. Then the lights was cutting off and on by themselves. Then I saw 2 heads floating in mid-air, and they said to do it this way and they was floating over the blade saw.
>
> Third: Rewrite this in your words and give it to your lawyer. Also tell him about how sorry you are, and how you love your ant [sic] and you wouldn't do anything to harm your family. Say how you keep seeing the devil in your mind. And you can't sleep and is there any way that you can convince the Judge to go to the Hosipital [sic] to get treatment.

On the reverse was written, "Jamie 1167 Treasure Cove. Mt. Pleasant South Caroline 29464." The document was recovered from a plastic bin located underneath appellant's bed. The bin also contained appellant's personal belongings, including "personal effects, papers, cards, magazines." A sheriff's deputy testified at trial that inmates in appellant's unit were not free to go from room to room, and appellant did not share his room with another inmate.

Jail records indicate that on March 14, 2006 appellant spoke with an unknown party by telephone. During the conversation, appellant wrote down a mailing address matching the address on the note found in appellant' jail cell.

At trial, appellant presented an insanity defense. Two psychologists testified that appellant was unable to understand the difference between right and wrong at the time appellant killed his aunt. In rebuttal, the Commonwealth called clinical psychologist Stanton E. Samenow, who testified he spent 11½ hours interviewing appellant, and consulted various other sources before concluding that appellant was malingering, or faking symptoms of insanity. In describing appellant's personal history, Dr. Samenow testified that appellant began using marijuana at age 13, and began consuming alcohol at age 12 or 13. He explained that appellant used cocaine and LSD as an adult. Dr. Samenow commented on appellant's anti-social behavior, including stealing from children at school, and spray-painting graffiti because appellant said it "gave [him] an adrenaline rush because it was illegal." In addition, Dr. Samenow explained that appellant once had thoughts about killing his father. During his testimony, the Dr. Samenow referenced appellant's criminal records in Virginia and Arizona.

The Commonwealth offered the following jury instruction:

> You may consider the character of the defendant when proven by the evidence, whether good or bad, along with the other facts and circumstances of the case in determining his guilt or innocence.

Over appellant's objection, the trial court granted the instruction and ruled:

> [A]lthough much of that evidence came out in connection with the issue of the background information as to whether or not the defendant was insane at the time of the offense, I still think it's there and the jury -- it's a proper statement of the law since there was evidence coming from many different areas as to the character of the defendant.

The jury convicted appellant of first-degree murder, and this appeal follows.

ANALYSIS

Admissibility of the Letter and the Audiotape

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988). However, "[b]y definition, when the trial court makes an error of law, an abuse of discretion occurs." Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000). Also, the party objecting to the admission of the evidence has the burden of proving that the trial court erred. Dunn v. Commonwealth, 20 Va. App. 217, 220, 456 S.E.2d 135, 136 (1995).

Generally speaking, "[e]vidence is admissible if it is both relevant and material," and it is inadmissible if it fails to satisfy these criteria. Evans-Smith v. Commonwealth, 5 Va. App. 188, 196, 198, 361 S.E.2d 436, 441, 442 (1987).

> "Evidence which 'tends to cast any light upon the subject of the inquiry' is relevant." Cash v. Commonwealth, 5 Va. App. 506, 510, 364 S.E.2d 769, 771 (1988) (quoting McNeir v. Greer-Hale Chinchilla Ranch, 194 Va. 623, 629, 74 S.E.2d 165, 169 (1953)). Evidence which tends to prove a material fact is relevant and admissible, "'unless excluded by a specific rule or policy consideration.'" Evans v. Commonwealth, 14 Va. App. 118, 122, 415 S.E.2d 851, 853-54 (1992) (quoting Cash, 5 Va. App. at 510, 364 S.E.2d at 771).

Pughsley v. Commonwealth, 33 Va. App. 640, 645, 536 S.E.2d 447, 449 (2000).

Appellant first challenges the trial court's admitting into evidence the letter found inside appellant's jail cell. Appellant argues that the letter is irrelevant to the issue of appellant's insanity at the time of the offense since the Commonwealth did not prove that appellant actually reviewed and understood the content of the letter before any of his mental health evaluations took place. Essentially, appellant contends that the note had no probative value because appellant had already met with various psychologists prior to coming into possession of the note. The Commonwealth responds that the letter is both material and relevant to the only issue at trial, namely, whether appellant was faking symptoms of insanity.[1] We agree with the Commonwealth.

The letter unquestionably instructs how to fabricate a mental illness. Furthermore, it was found in appellant's jail cell among his personal belongings. Although the letter was not discovered until two weeks before trial, the Commonwealth presented evidence from which the jury could reasonably infer that this document had been in appellant's presence since at least March 14, 2006 and that appellant had knowledge of its content.

In proving its case for fabrication, the Commonwealth presented testimony of Dr. Samenow, who interviewed appellant extensively between February 6 and April 7, 2006. Dr. Samenow testified that during one of his interviews, appellant described seeing "demons

---

[1] The Commonwealth argues that this issue is defaulted pursuant to Rule 5A:18. The Commonwealth contends that at trial appellant objected on the ground that someone planted the letter in appellant's cell, while on appeal, appellant argues the letter is irrelevant to the issue of appellant's sanity at the time of the offense. We find appellant sufficiently preserved this issue below by arguing the "probative value of the letter is nil . . . . " The Commonwealth's response that the letter is "probative" to the issue of appellant's sanity allowed the court to consider whether the letter's prejudicial nature outweighed its probative value. See Robinson v. Commonwealth, 13 Va. App. 574, 576, 413 S.E.2d 885, 886 (1992) ("The purpose of the contemporaneous objection rule embodied in Rule 5A:18 is to inform the trial judge of the action complained of in order to give the judge the opportunity to consider the issue and to take timely corrective action, if warranted, in order to avoid unnecessary appeals, reversals and mistrials.").

with fangs" during the killing of his aunt. The letter found in appellant's jail cell discusses demons and how at least one demon helped strangle the aunt. During a telephone conversation on March 14, 2006, appellant wrote the Treasure Cove address on the reverse side of the document in question. From this, the jury could reasonably conclude that appellant came into possession of the letter no later than March 14, 2006, long before Dr. Samenow completed his interviews, and retained the letter until it was discovered on April 20. Moreover, the jury could reasonably find that because appellant referred to "demons with fangs" during at least one interview, appellant had read the letter and understood its meaning prior to Dr. Samenow completing his evaluation. We find that the letter was relevant and material to the Commonwealth's theory that appellant was fabricating symptoms of insanity. Accordingly, we find no abuse of discretion by the trial court in admitting this evidence.

Appellant next argues that the conversation he had in the car on the way to the police station should have been admitted to show his state of mind at the time of the murder. The Commonwealth responds that the trial court properly excluded the statement as hearsay. In any event, contends the Commonwealth, the trial court allowed the expert witnesses to testify about the statement, so any error that may have occurred was harmless. We agree with the Commonwealth that the error was harmless.

Hearsay is "[a] statement other than one made by the declarant while testifying at trial - offered in evidence to prove the truth of the matter asserted." Black's Law Dictionary 649 (5th ed. 1979). See also Brown v. Commonwealth, 25 Va. App. 171, 177, 487 S.E.2d 248, 251 (1997).

> "Whether an extrajudicial statement is hearsay depends upon the purpose for which it is offered and received into evidence. If the statement is received to prove the truth [or falsity] of its content, then it is hearsay and, in order to be admissible, must

> come within one of the many established exceptions to the general prohibition against admitting hearsay."

Id. (quoting Hanson v. Commonwealth, 14 Va. App. 173, 187, 416 S.E.2d 14, 22 (1992)).

Appellant did not offer the statement for the truth of its content. Indeed, he was not trying to show his uncle was a "god or wizard" or that his aunt was a "devil woman." Appellant was attempting to show only that he made the bizarre and disconnected statement. The actual content of the statement was irrelevant to the purpose for which it was being offered. Thus, the statement itself is not hearsay and should not have been excluded on that basis.

Although the trial court erroneously refused to admit the statement, we find the error harmless.

A non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. "'[A] fair trial on the merits and substantial justice' are not achieved if an error at trial has affected the verdict." Lavinder v. Commonwealth, 12 Va. App. 1003, 1006, 407 S.E.2d 910, 911 (1991) (*en banc*). "[T]he harmless error doctrine enables an appellate court or a trial court when considering a motion to set aside a verdict to ignore the effect of an erroneous ruling when an error clearly has had no impact upon the verdict or sentence in a case." Hackney v. Commonwealth, 28 Va. App. 288, 296, 504 S.E.2d 385, 389 (1998). "An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." Lavinder, 12 Va. App. at 1006, 407 S.E.2d at 911.

Appellant acknowledges that the jury heard the substance of his interview with police through the testimony of the expert witnesses. Dr. Ronald M. Boggio, a clinical psychologist called to testify on behalf of appellant, explained that he reviewed a tape of the conversation with appellant in the police car that was "quite confirming of the presence of psychosis." Dr. Boggio

- 7 -

testified that during the conversation, appellant stated, "I haven't had any shots . . . " and that appellant referred to his aunt as a "devil woman." Dr. Boggio also testified that appellant talked about a face changing.

Dr. Michelle Dana Ebright, a licensed clinical psychologist, opined that appellant did not understand the difference between right and wrong when he killed his aunt. She stated that she relied primarily on two sources of information in reaching her opinion: appellant's medical history, and audiotapes and transcripts of police interrogations. She referenced specifically the conversation in the police car and characterized it as appellant "basically talking to himself." She said appellant commented, "His face was in my aunt's face" and that appellant stated his uncle could explain what had occurred. She also noted that appellant repeated the word "orange," said that he was not on drugs, and referred to his aunt as the devil. Dr. Ebright concluded that appellant was unable to organize his thoughts and nothing that he said made any sense.

Despite the reality that the jury heard extensive expert testimony regarding appellant's sanity at the time of the offense, much of which referred specifically to appellant's conversation in the police vehicle, appellant argues that without actually hearing the conversation, the jury was unable to evaluate appellant's tones and inflections during the exchange. However, the record shows that the jury was given six separate compact discs containing appellant's interviews with police shortly after appellant spoke with the police in the car on July 15, 2005. From these recordings, the jury was able to hear appellant's voice and evaluate his intonation soon after being taken into custody. Thus, it plainly appears from the record that the exclusion of the tape had no impact on the jury's verdict or the sentence, as the jury knew of the bizarre conversation with police, heard appellant's voice and inflections soon after the killing, and had the opportunity to fully consider such factors in their deliberations.

Jury Instruction

"Usually, in legal parlance, where reference is made to the character of the accused, 'character' is used as a synonym for 'reputation.'" Zirkle v. Commonwealth, 189 Va. 862, 871, 55 S.E.2d 24, 29 (1949). It is well established that "[t]estimony to prove the . . . character of the defendant in a criminal prosecution must relate and be confined to proof of the opinion that the people of the community have of him." Byrdsong v. Commonwealth, 2 Va. App. 400, 402, 345 S.E.2d 528, 529 (1986). Equally well established is the rule that "the Commonwealth is not permitted to introduce any testimony of the bad reputation of the accused until the accused has put . . . his character in issue." Zirkle, 189 Va. at 871, 55 S.E.2d at 29. "A character witness is allowed to summarize what he has heard or not heard in the community relating to the truthfulness *or other relevant traits* of an accused, although much of it may have been said by persons less qualified to judge the defendant's character than the witness himself." Byrdsong, 2 Va. App. at 406, 345 S.E.2d at 531 (citing 29 Am. Jur. 2d Evidence § 345 (1967)) (emphasis added). While the Commonwealth is permitted to rebut evidence of an accused's reputation for peace and good order, it is improper to place before the jury a specific act of misconduct of the accused that has no bearing upon his general reputation in the community. Weimer v. Commonwealth, 5 Va. App. 47, 58, 360 S.E.2d 381, 386 (1987).

Appellant argues that the jury instruction on his character was improper because there was no reputation character evidence introduced at trial and the instruction "invited the jury to apply improper bad acts to imply guilt of murder." The Commonwealth responds that because the only issue before the jury was whether appellant was fabricating insanity, his character was relevant and the instruction was properly given. In any event, argues the Commonwealth, even if the instruction was improperly given, any error was harmless. We agree with the Commonwealth that the error was harmless. While there was no evidence that satisfied the legal

- 9 -

definition of "character," namely, reputation evidence, there was unobjected testimony presented during the trial that showed appellant's propensity toward violence. Thus, with or without the instruction on character, the Commonwealth presented a proper argument to the jury that was supported by evidence adduced at trial.

As a preliminary matter, we find that no evidence tended to show appellant's reputation in the community, and thus, no character evidence was before the jury. The instruction should not have been given. See Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978) ("Although an instruction correctly states the law, if it is not applicable to the facts and circumstances of the case, it should not be given.").

If a trial judge improperly gives an instruction on character when character is not an issue at trial, the error is not a constitutional error. See Poole v. Commonwealth, 211 Va. 262, 265-67, 176 S.E.2d 917, 919-20 (1970); see also Greer v. United States, 245 U.S. 559, 560-61 (1918) (discussing the evidentiary rule that the prosecution cannot introduce character evidence until the defendant has done so). Thus, the non-constitutional standard of review governs our determination whether the error was harmless.

As previously stated, a non-constitutional error is harmless only "[w]hen it plainly appears from the record and the evidence given at the trial" that the error did not affect the jury's verdict. Code § 8.01-678. This standard applies "in criminal as well as civil cases," Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001), and requires us to determine the following:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that

> substantial rights were not affected. . . . If so, or if one is left in
> grave doubt, the conviction cannot stand."

Id. at 260, 546 S.E.2d at 732 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

As previously noted, although the jury was instructed that it could consider appellant's character "when proven by the evidence," no evidence proved character in the manner as contemplated by our case decisions. See Zirkle, 189 Va. at 871, 55 S.E.2d at 29. Specifically, there is no reputation evidence of appellant's good or bad character for the "trait involved in [this] prosecution." Byrdsong, 2 Va. App. at 403, 345 S.E.2d at 530. Nevertheless, there was evidence before the jury that appellant had a violent character. We acknowledge that during the trial the Commonwealth introduced evidence of specific acts of misconduct and violence from appellant's past. Appellant suggests that the granting of the improper instruction was prejudicial because the heart of the Commonwealth's closing argument centered on appellant's character and focused on his violent nature. However, this evidence was not objected to and was therefore before the jury for consideration. In commenting on that evidence in summation, the Commonwealth made no improper comments or argument. The Commonwealth's argument on appellant's violent nature was fully supported by testimony that was admitted during the trial without objection. Notably, there was also no objection to the Commonwealth's closing statement.

"'The well settled rule that improper evidence introduced by a party, if unobjected to by his opponent, will be considered by the appellate court as if it were proper evidence, on the ground that the opponent has waived objection to it . . . .'" Brame v. Nolen, 139 Va. 413, 420, 124 S.E. 299, 302 (1924) (quoting Wessel v. Bargamin, 137 Va. 701, 712, 120 S.E. 287, 291 (1923)). Thus, in determining whether the error was harmless, we review the entire record.

In recounting appellant's childhood, Dr. Boggio testified that appellant's early onset of depression resulted in instability. He explained, "You start to see the instability in oppositional

- 11 -

behavior." Dr. Boggio testified that one of appellant's daycare workers once described appellant as "rude, very demanding and uncooperative." Moreover, Dr. Boggio testified that he reviewed a note from appellant's grandmother that read:

> Our immediate concern is our grandson, Matthew Pahno. We see all the signs of stress, anger and distrust. He is very destructive. He is now physically violent and seems not to care if he hurts someone or somebody. Matthew abused Luke outside in the sidewalk repeatedly by causing Luke to fall while skating.

> I sat him down on the living room couch and told him to cool off and think about what he had done. He had viciously kicked Luke in the abdomen with his new skates. I turned to leave the room and he kicked me in the buttocks with his skates.

Additionally, appellant's grandmother wrote that she refused to purchase a pellet gun for appellant, telling appellant that she had a concern that appellant might accidentally shoot Luke. Appellant responded, "So?" When his grandmother repeated her concern that appellant could accidentally shoot Luke, appellant "truly did not seem to care."

Dr. Boggio confirmed that a record from Central State Hospital dated September 2, 2005 indicated that appellant once tried to "strike staff," continued to fight, and required emergency intervention. The record characterized appellant as aggressive and suggested he learn anger management techniques.

Dr. Samenow testified that appellant would sometimes go on "vandalism rampages" when he had been drinking. Appellant also told his father that he wished he could kill him. Dr. Samenow stated that he spoke with appellant's former stepmother, who described appellant as "extremely angry." Dr. Samenow recalled a conversation he had with the stepmother:

> She tried to stay clear of him and that he had kept everybody on edge. She said that even over the most minor thing, he could just become furious. For example, if there was the wrong kind of milk in the refrigerator, she said that, with Matt, you could tell he was about to explode. We'd take off rather than risk getting hurt.

- 12 -

Appellant's stepmother also told Dr. Samenow that she was afraid to leave appellant at home alone with his brother because appellant "was abusive to his brother." She said "anything could set him off." She frequently observed that appellant would stiffen up, clench his fists, yell, scream, punch, stomp, slam doors, and occasionally break things. She told Dr. Samenow that living with appellant was "very scary." On one occasion when his stepmother told him to get off the phone, appellant hit her with a tray from a highchair.[2]

In view of these facts, we can say it plainly appears that "the verdict and the judgment were not substantially affected" by the granting of the instruction. See Clay, 262 Va. at 261, 546 S.E.2d at 732. Had the instruction been refused, the evidence of appellant's violent tendencies would still be before the jury. Without the instruction, the jury could have, and apparently did, accept the Commonwealth's closing argument that appellant was prone to violence, thus refuting appellant's insanity defense. Thus, we find ample evidence in this record to support the Commonwealth's argument that appellant was inclined towards violence and such was his character in general. We hold, therefore, that the error in granting the instruction was harmless.

CONCLUSION

For the foregoing reasons, we find that the trial court did not err in admitting into evidence the letter found in appellant's jail cell. We find that any error in excluding appellant's statement or in granting the jury instruction was harmless. Therefore, appellant's conviction is affirmed.

Affirmed.

---

[2] Appellant never asked for a limiting instruction on Dr. Boggio's or Dr. Samenow's testimony.