COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Coleman, Elder,
          Bray, Annunziata, Bumgardner and Senior Judge Overton
Argued at Richmond, Virginia


ROBERT LEWIS CLAY
                                          OPINION BY
v.   Record No. 1893-97-2      JUDGE ROSEMARIE ANNUNZIATA
                                        AUGUST 1, 2000
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Charles L. McCormick, III, Judge

J. William Watson, Jr. (Watson & Nelson,
P.C., on brief), for appellant.

Leah A. Darron, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


On October 5, 1999, a panel of this Court affirmed the

convictions of Robert Lewis Clay for second degree murder and

use of a firearm in the commission of murder.  We granted Clay's

petition for rehearing en banc to consider his contention that

the trial court erred by (1) refusing to allow him to

cross-examine witnesses Thelma Burns and Carlos Ragland during

the voir dire conducted outside the jury's presence, (2)

admitting hearsay evidence from these two witnesses, and (3)

refusing to allow him to call Deputy David Martin as a witness.

We find no reversible error and, for the following reasons, we

affirm the convictions.

## FACTS

On August 25, 1996, Clay entered the Halifax County Sheriff's Office and asked to speak to Lieutenant Ernest Powell. Appearing "shook-up" and "upset," Clay told Powell he had shot his wife, Joy Clay. Powell told the dispatcher to call the rescue squad. When the rescue squad arrived at Clay's home, they found Mrs. Clay's dead body on the den floor. Mrs. Clay had died from two gunshot wounds.

At trial, Thelma Burns testified outside the presence of the jury, and later before the jury, that she spoke with Mrs. Clay every other day. In the months prior to her death, Mrs. Clay asked Burns whether she could move boxes to Burns' home, as she planned to move because she "was very scared of what her husband might do to her." During one telephone conversation, Burns overheard Clay say to Mrs. Clay, who had just attended a funeral, "I'm going to kill you bitch, you can't never go with me to any of my family's funerals and I'm tired of you, I'm going to kill you, bitch." During a telephone conversation only days before Mrs. Clay was killed, Burns overheard Clay say to Mrs. Clay, "[Y]ou might have got that school bus, but you won't drive that school bus."[1]

---

[1] Although not entirely clear from the record, we deduce that Mrs. Clay had recently obtained a job as a school bus driver.

At trial, Carlos Ragland testified outside the presence of the jury, and subsequently to the jury, that Mrs. Clay told him about a month before her death that she was planning to move "because she was afraid of what might happen to her." During another telephone conversation, Ragland overheard Clay call Mrs. Clay a "B" and say that "he was going to kill her because he was tired of her."

Robert Lewis Clay, Jr., the only son of Clay and Mrs. Clay, testified that his mother told him in phone conversations during the month leading up to her death that "she was moving away and getting another job in Roxboro somewhere" because she "couldn't take it no more." Robert testified that Clay was an avid hunter who practiced "safe firearms." Robert never saw Clay load or unload a gun inside the house, and Clay taught him to keep the safety switch on until ready to shoot.

Clay testified that when he confronted his wife about $5,000 missing from his gun cabinet, she first denied knowing anything about the money but then admitted taking the money and refused to return it. Clay "just got all upset" and took a gun from his gun cabinet. Clay testified that he thought his wife would tell him where the money was if she saw the gun. Clay claimed that when he "raised the gun up it just went off." Clay claimed the gun discharged twice, although he did not recall pulling the trigger.

-

CROSS-EXAMINATION DURING VOIR DIRE

Clay contends the trial court erred by refusing to allow him to cross-examine Burns and Ragland during the voir dire conducted outside the presence of the jury. He claims that the Sixth and Fourteenth Amendments to the Constitution of the United States, and Article I, Section 8, of the Virginia Constitution give him the right to confront his accusers. Therefore, he contends the trial court erred in refusing to allow defense counsel to cross-examine Burns and Ragland during voir dire conducted outside the presence of the jury.

Although Clay objected when the trial judge refused to allow defense counsel to cross-examine Burns and Ragland on voir dire conducted out of the presence of the jury, he did not do so on constitutional grounds and did not specify any constitutional grounds. No ruling of the trial court will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice. See Rule 5A:18.

The record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18. Prior to the trial, defense counsel advised the trial court that he had ascertained that the Commonwealth might present certain witnesses to whom Mrs. Clay made statements before she died. He assumed they would be adverse. Defense counsel stated that "it

-

would be appropriate to let Mr. Greenbacker [Commonwealth's Attorney] ask them the questions that he's going to ask them and hear their responses so I can make the appropriate objections, because there's some indication that she said she was going to leave or that he had been mean to her or something along those lines. . . ."

The Commonwealth's Attorney stated that he did not want to have a mini-trial but would "submit to the court or make a proffer." Defense counsel replied: "All I wanted to do was to see if I could hear what they were going to say before so I could object to it, preserve the record, make the appropriate objections, and then the jury can hear whatever you see fit." Both the trial judge and the Commonwealth's Attorney agreed to this procedure.

In due course, the Commonwealth called Burns as a witness. She submitted to what is called in the record a "Voir Dire Examination," out of the presence of the jury. Mr. Greenbacker first fully examined the witness. When he concluded, defense counsel commenced to cross-examine the witness. The Commonwealth's Attorney objected, stating, "[I] think the proffer of the evidence without cross-examination is probably the appropriate way to go at this point." The trial judge sustained the objection and refused to permit cross-examination until such time as the witness was called as a witness in the trial before the jury. After argument of counsel, the judge

-

further held that the evidence was admissible.  Upon this record, we find no abuse of the trial court's discretion.  The purpose of the voir dire, as enunciated by defense counsel, was to permit defense counsel to hear the evidence prior to trial for the purpose of permitting him to "object to it, preserve the record, [and] make the appropriate objections."  That purpose was met.  Furthermore, in the presence of the jury, defense counsel ultimately fully cross-examined both witnesses.

### VICTIM'S HEARSAY TESTIMONY

Clay contends the trial court erred in admitting in evidence the testimony of Burns and Ragland regarding statements made to them by the victim, Joy Clay, indicating that she was going to leave Clay because she was afraid of what he might do to her.[2]  Burns testified that on numerous occasions before the death of Joy Clay, she had telephone conversations with Mrs. Clay in which Mrs. Clay "asked [her if she] could . . . bring some boxes to [her] house.  [Mrs. Clay] stated that she was going to move because she was very scared of what her husband might do to her."  Burns testified she received like requests and intentions up to the time of Mrs. Clay's death.

---

[2] Clay does not challenge the admissibility of the statements made by Clay to Joy Clay, and overheard by Burns and Ragland in telephone conversations, to the effect that he was going to kill her.  These statements are considered herein under another exception to the hearsay rule.

-

In similar phone conversations, Ragland testified the victim "told [him] she was planning on moving to Roxboro, North Carolina" and "she was going to move because she was afraid of what might happen to her." Clay argued that the evidence that Joy Clay had to get out of the house because she was afraid of what he might do to her did not prove that he intended to kill her. He contends the evidence was, therefore, not material, was highly prejudicial, and should not have been admitted in evidence. We disagree and find the evidence admissible under the state of mind exception to the hearsay rule to show Clay's motive and intent.

A person seeking to have hearsay declarations admitted must clearly show that they are within an exception to the rule. See Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (citations omitted); Foley v. Commonwealth, 8 Va. App. 149, 161, 379 S.E.2d 915, 921, aff'd en banc, 9 Va. App. 175, 384 S.E.2d 813 (1989). Hearsay evidence is inadmissible at trial unless it falls into one of the recognized exceptions to the rule. See Evans-Smith v. Commonwealth, 5 Va. App. 188, 197, 361 S.E.2d 436, 441 (1987).

The Commonwealth argues that the testimony of Burns and Ragland relating Joy Clay's statements regarding her fear of Clay fall within the state of mind exception. The problem which arises in connection with the admissibility of such statements

-

made by homicide victims is discussed in <u>McCormick on Evidence</u>:

"The possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance. . . . [T]he cases have generally excluded the evidence. . . ." <u>McCormick on Evidence</u> § 276 (John W. Strong, ed., 4th ed. 1992) (footnotes omitted); <u>see also</u> <u>United States v. Brown</u>, 490 F.2d 758, 766 (D.C. Cir. 1973).

Notwithstanding the general rule favoring exclusion, several exceptions have evolved, dictated by recurring factual circumstances which make the statements' relevance manifest.

> [I]n some circumstances, [a victim's state of mind] statements may be admissible under other hearsay exceptions, such as that for startled utterances or dying declarations. . . . There is broad agreement that such statements are admissible where the defense claims self-defense, suicide, or accidental death, because in each of those situations the decedent's fear helps to rebut aspects of the asserted defense.

<u>McCormick on Evidence</u> § 276; <u>see also</u> <u>Brown</u>, 490 F.2d at 766.[3]

---

[3] In <u>Brown</u>, the United States Court of Appeals observed as follows:

> While there are undoubtedly a number of possible situations in which such statements may be relevant, the courts have developed three rather well defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant's claim of self-defense as justification for the killing. . . . Second, where the defendant

Under Virginia law, statements that tend to prove the state of mind of the victim "are admissible . . . [only] when the statements are relevant and material."  Johnson v. Commonwealth, 2 Va. App. 598, 602, 347 S.E.2d 163, 165 (1986) (citations omitted); see Kauffmann v. Commonwealth, 8 Va. App. 400, 406, 382 S.E.2d 279, 282 (1989).[4]  We also noted in Hanson v. Commonwealth, 14 Va. App. 173, 416 S.E.2d 14 (1992), that

> [f]or the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused, such as by showing "previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant."

------

> seeks to defend on the ground that the deceased committed suicide . . . . A third situation involves a claim of accidental death . . . . In [cases where the defense is "accidental death"] the deceased's statements of fear as to guns or of defendant himself . . . are relevant in that they tend to rebut this defense.

Brown, 490 F.2d at 766-67.

[4] The admissibility of declarations under the state of mind exception is also conditional on three prerequisites:  1.  The statement must refer to a presently existing state of mind. Although the mental state of emotion must exist at the time of the declaration, it may relate to matters occurring in the past or in the future; 2.  There must be no obvious indication of falsification or contrivance; 3.  The mental condition must be relevant to the case. See Charles E. Friend, The Law of Evidence in Virginia § 18-16 (5th ed. 1999).

-

Id. at 188-89, 416 S.E.2d at 23 (quoting Brown, 490 F.2d at 765-66).[5]

Applying these principles, we find that the state of mind of a homicide victim is relevant and material in cases where accidental death is mounted as a defense.  See Hanson, 14 Va. App. at 188, 416 S.E.2d at 23 (citing Evans-Smith, 5 Va. App. at 198, 361 S.E.2d at 442); see also West v. Commonwealth, 12 Va. App. 906, 910, 407 S.E.2d 22, 24 (1991). The inquiry does not end, however, with a court's determination of relevancy.  The proffered evidence must be further examined by the court to "undertake the familiar balancing process in which the relative degrees of relevance and prejudice are weighed and determined."  Brown, 490 F.2d at 774; McCormick on Evidence § 185.  Where outweighed by the prejudicial effect it

---

[5] To the extent Hanson may be read to include a requirement that the state of mind declaration must have been communicated to the accused when the defense is accidental death, it is dicta.  See Hardy v. Commonwealth, 110 Va. 910, 924, 67 S.E. 522, 527 (1910) (when defendant raises a justification defense, the victim's statement must have been communicated to the defendant for it to be introduced in support of the defense); Taylor v. Commonwealth, 31 Va. App. 54, 63 n.4, 521 S.E.2d 293, 297 n.4 (1999) (en banc) (accidental death not included among the justification defenses).  See also Brown, 490 F.2d at 765-66, 773-78, cited with approval in Hanson, 14 Va. App. at 188-89, 416 S.E.2d at 23, which makes clear that, while a requirement that the victim's statements be communicated to the defendant may inhere in the exception when the hearsay statements are sought to be introduced in cases involving self-defense, the exception is not otherwise predicated on proof of such communication.

-

may have on the fair determination of the issues, such evidence will be excluded.  See 490 F.2d at 774.

In this case, Clay was charged with first degree murder and use of a firearm in the commission of murder.  In a first-degree murder case, the Commonwealth must prove that the defendant killed the victim, that the killing was malicious, and that the killing was willful, deliberate and premeditated.  See Painter v. Commonwealth, 210 Va. 360, 364, 171 S.E.2d 166, 169-70 (1969) (citing McDaniel v. Commonwealth, 77 Va. 281, 283-84 (1883)). Clay's contention that the killing was accidental put his state of mind at issue, see Parsons v. Commonwealth, 138 Va. 746, 777, 121 S.E. 68, 71 (1924), and concomitantly established the predicate for the admission of the challenged hearsay testimony. Testimony of the victim's fear is relevant to Clay's claim that the shooting was accidental and not deliberate.  See McCormick on Evidence § 185; Brown, 490 F.2d at 773-74.  Logically, a deceased's fear of an individual accused of murder is inconsistent with a claim that the events in question culminating in the death were the result of "pure chance."  See Black's Law Dictionary 15 (6th ed. 1990) (an "accident," "if happening wholly or partly through human agency, [is] an event which under the circumstances is unusual and unexpected by the person to whom it happens").  Thus, the hearsay statements in question tend to establish Clay's motive and intent and they are probative rebuttal of his contention that the shooting was not

willful or deliberate.  See Batten v. Commonwealth, 190 Va. 235,
245-46, 56 S.E.2d 231, 236-37 (1949) (the accused's state of
mind is material in a homicide case); Parsons, 138 Va. at 777,
121 S.E. at 71; Hanson, 14 Va. App. at 188-89, 416 S.E.2d at 23.
See also Elliott v. Commonwealth, 30 Va. App. 430, 437-38, 517
S.E.2d 271, 275 (1999) (where the accused claims the victim's
death was an accident and not murder, "the state of mind of the
victim is relevant to prove the state of mind of the accused and
the nature of their relationship").

We must now determine whether the prejudicial effect of
such evidence outweighed its probative value.  Some of the
factors which may be considered in determining whether the
evidence is unduly prejudicial and the trial court abused its
discretion in judging the balance in favor of admission include
whether the content of the statements tends to "arouse the
jury's hostility or sympathy for one side without regard to the
probative value of the evidence," McCormick on Evidence § 185,
at 780, and whether it tends to confuse or mislead the trier of
fact, see id. at 781, or distract it to irrelevant
considerations.  See id.  Finally, where the proofs and
counterproofs of such facts require an inordinate amount of time
to accomplish, the evidence may properly be excluded.  See id.;
State v. Patricia A. M., 500 N.W.2d 289, 294 (Wis. 1993)
("Evidence is unduly prejudicial when it threatens fundamental
goals of accuracy and fairness of trial by misleading jury or by

-

influencing jury to decide case on improper basis, and unfairness attaches if evidence tends to influence outcome by improper means, or it appeals to jury's sympathies, arouses its sense of horror, promotes its desire to punish or otherwise causes jury to base its decision on extraneous considerations.").  The particular factors that may be determinative vary with the case.  See Evans-Smith, 5 Va. App. at 197, 361 S.E.2d at 441; see also Beck v. Commonwealth, 253 Va. 373, 382, 484 S.E.2d 898, 904 (1997).

We find the probative effect of the evidence was not outweighed by its potential for prejudicing the jury in its consideration of the issues.  The witnesses' statements were limited to describing the victim's plan to move because she feared what her husband might do to her; neither past acts nor threats by Clay were specifically referenced or recounted. Thus, the witnesses' statements effectively reflected the victim's state of mind and not Clay's prior conduct.  Cf. Brown, 490 F.2d at 777 (victim's statement which included a reference that she feared the accused would kill her, found to be improper); id. at 775 ("[T]he more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse." (citations omitted)); McCormick on Evidence § 276.  Furthermore, the statements were not highly emotional or inflammatory in content and they were thus unlikely to distract the jury from the main issues in the case.

-

Additionally, the statements were relevant as rebuttal to the defense of accidental death, and, in light of the proper admission of Clay's threats to kill his wife, were unlikely to confuse or mislead the jury in this case. Finally, an inordinate amount of time was not consumed in the offer of proof and counterproofs in this case. For these reasons, we cannot say the trial court abused its discretion in admitting the statements.

<u>REFUSAL TO ALLOW MARTIN TO TESTIFY</u>

After the Commonwealth rested its case, Clay attempted to call Deputy David Martin as a witness on his behalf. The Commonwealth objected, contending that Clay's statements to Martin were inadmissible hearsay and that Clay was attempting to imply to the jury that evidence had been "improperly suppressed by the prosecution." The Commonwealth also contended that Clay was attempting to admit Clay's statements into evidence through Martin when he did not intend to testify himself. Clay asserted that the court should permit Martin to testify because he had observed Clay after the shooting and had taken written statements from him at the sheriff's office. Martin had no other participation in the case.

The trial court excluded the testimony of Martin, stating that "it's kind of setting up a straw man to knock it down or something."

-

Clay proffered for the record the following summary of

Martin's proposed testimony:

> His name is David Martin. He was instructed
> to obtain a full statement from Mr. Clay if
> he was willing to give one. He indicated he
> would give one. He was read his standard
> Miranda rights. The statement is
> approximately four pages long in Martin's
> handwriting. About thirty minutes later,
> Martin returned and asked Clay some more
> questions. During the thirty minute
> interim, Clay was in the presence of Martin,
> except maybe for a second or two. Clay's
> demeanor throughout the entire process was
> somber and quiet. Those two words best
> described Clay to Martin. Clay was
> cooperative.

Lieutenant Powell had previously testified that Clay arrived at

the sheriff's department appearing "shook up or shaken" and

upset. Clay asked to speak privately with Powell and admitted

killing his wife. He gave his house key to Powell to make sure

the law enforcement officers could enter the house. This

evidence showed that Clay sought out the police to admit

shooting his wife, that he was cooperative, and that he was

visibly shaken and upset.

Martin's testimony would have been corroborative of Clay's

testimony but cumulative of Powell's testimony.

"[C]orroborative testimony and cumulative testimony are not the

same thing. Cumulative testimony is repetitive testimony that

restates what has been said already and adds nothing to it. It

is testimony of the same kind and character as that already

given." Massey v. Commonwealth, 230 Va. 436, 442, 337 S.E.2d

-

754, 758 (1985) (citation omitted).  Corroborative evidence is evidence that does not emanate from the defendant's mouth, does not rest wholly upon the defendant's credibility, but is evidence that adds to, strengthens, and confirms the defendant's testimony.  See id. at 442-43, 337 S.E.2d at 758; see also Proctor v. Town of Colonial Beach, 18 Va. App. 28, 441 S.E.2d 233 (1994); Cash v. Commonwealth, 5 Va. App. 506, 364 S.E.2d 769 (1988).  "[W]here evidence is merely cumulative its introduction may be limited by the court.  Yet, because of the constitutional right to call for evidence in one's favor, even cumulative evidence should sometimes be admitted.  Where testimony is material 'even though cumulative to some extent' it should nonetheless be considered."  Massey, 230 Va. at 442, 337 S.E.2d at 758.

Clay was entitled to call witnesses in his defense, and Martin's testimony, subject to appropriate objections by the Commonwealth's Attorney, was admissible.  We find the trial court erred in excluding Martin as a witness.

It remains only to determine whether the trial court error was harmless beyond a reasonable doubt.  See Chapman v. California, 386 U.S. 18, 22-23 (1967); Scott v. Commonwealth, 25 Va. App. 36, 42, 486 S.E.2d 120, 122-23 (1997); Hope v. Commonwealth, 8 Va. App. 491, 497, 386 S.E.2d 807, 810-11 (1989).  Where the evidence of guilt is overwhelming, the error will be held harmless.  Scott, 25 Va. App. at 42, 486 S.E.2d at

-

123. "We will not reverse a judgment for error in excluding evidence where it appears from the record that the error . . . could not and did not affect the verdict." Pace v. Richmond, 231 Va. 216, 226, 343 S.E.2d 59, 65 (1986) (internal quotation omitted) (citing, inter alia, Williamson v. Commonwealth, 180 Va. 277, 284, 23 S.E.2d 240, 243 (1942)). We find that the erroneous exclusion of the evidence was harmless.

The evidence overwhelmingly proved that Clay deliberately shot his wife. He admitted in a detailed, written statement to Deputy David Martin that he shot her. In his written statement and in his testimony at trial, Clay stated that he discovered $5,000 missing from his gun cabinet. He went to the den where his wife was sitting on a sofa. He confronted her about the missing money and she denied knowing anything about it, but then admitted taking the money. She refused to return it. Clay testified that he became upset. He went to the bedroom where his gun cabinet was located. He obtained one of his several guns. He did not look to see if it was loaded, and he did not load it. He then went back to the door of the den where his wife was seated. Clay told her, "I needed the money," raised the gun up, and it went off. He did not remember discharging the gun and did not remember pulling the trigger. Clay testified that he "thought if she seen the gun she might tell me where my money was at." He testified the gun went off twice.

-

Clay's son testified that he was the executor of his mother's estate and went through her papers and effects. He never found any cash as large as "a thousand dollars or two thousand dollars." He did not find that she had transferred any large sum of money to or from any accounts. Clay stated in his statement to Deputy Martin that he never found the $5,000. It can be reasonably inferred from this testimony that the $5,000 never existed and that the dispute over the funds between Clay and his wife was fabricated to conceal his guilt. See Rollston v. Commonwealth, 11 Va. App. 535, 547-48, 399 S.E.2d 823, 830 (1991).

Robert Clay, Jr., further testified that he grew up in the household with his parents, that his father was a hunter and hunted every hunting season, that his father had "over three" firearms, and that his father taught him how to hunt. Both men always "practiced safe firearms." He never saw his father load or unload a gun in the house. His father always cleaned his guns regularly during the off-season. Robert had never known his father to keep a gun in his house that had shells chambered in it.

James L. Pickleman, an employee at the Virginia Division of Forensic Science Laboratory in the firearms section, testifying as an expert in firearms, stated that if the gun was loaded, one would have to push the safety switch open and then pull the trigger to fire the gun. This action fires the shell in the

-

chamber.  The murder weapon is automatic loading; the firing of the shell ejects it from the gun.  When fired, the pellets are expelled from the muzzle, the recoil action pushes the bolt back and discharges the empty shell, and the next shell from the magazine is loaded into the chamber.  The gun is then ready to be fired again.  However, the trigger would have to be pulled again to fire the second shot.  Pickleman further testified that the trigger mechanism on the weapon would not fire easily, stating that it would take three and three-quarters pounds of pressure to pull the trigger on each occasion.  He further testified that the only way the gun could fire the second time would be for the trigger to be pulled by applying the necessary amount of pressure.  Pickleman's testimony provided strong evidence that Clay did not accidentally fire the shotgun.

To further meet Clay's defense of accidental death and to prove the motive and intent of the accused, Burns and Ragland testified to the threats Clay made against his wife.  During one telephone conversation between Burns and the victim, Burns overheard Clay in the background say to Joy Clay, who had just returned from attending a funeral, "I'm going to kill you bitch, you can't never go with me to any of my family's funerals and I'm tired of you, I'm going to kill you, bitch."  Ragland also testified that during a telephone conversation with Joy Clay, he

-

heard Clay in the background call his wife a "B" and say that "he was going to kill her because he was tired of her."[6]

Finally, Dr. Glen Robert Groben, a medical examiner, testified that the victim received two shotgun wounds to the body. One wound was to the head and chest; the other was to the left side of the body. In his opinion, both wounds were lethal and the victim would have died in minutes from loss of blood.

Evaluating the error in the context of all the evidence in the case, we find that, had the evidence been admitted, it would not have affected the verdict. There is little difference between Martin's proffered testimony and that given by Clay and Lieutenant Powell. In Martin's testimony, Clay was reported to be somber, quiet, and was cooperative during the time the statements were taken in the calm of the sheriff's office. That Clay first appeared at the sheriff's office and appeared "shaken" and "upset" does not contradict Martin's testimony that he appeared "somber" and "quiet" when giving the statement. The difference in the two statements is inconsequential, and Martin's excluded testimony would have added nothing to the evidence presented by the testimony of Powell and Clay. We find

_____

[6] This evidence was admissible as an exception to the hearsay rule when offered by the prosecution because it constituted the statement of an opposing party. The jury was entitled to consider it to prove Clay's motive and intent. See Alatishe v. Commonwealth, 12 Va. App. 376, 378, 404 S.E.2d 81, 82 (1991).

-

that the error was harmless because it could not have affected the outcome of the case.

Accordingly, the trial court's judgment is affirmed.

<u>Affirmed</u>.

Benton, J., with whom Elder, J., joins, dissenting.

I dissent from the part of the opinion styled <u>Victim's</u> <u>Hearsay Testimony</u> and the harmless error analysis in the part of the opinion styled <u>Refusal to Allow Martin to Testify</u>.

I.

At trial, the Commonwealth proved by the testimony of several witnesses that in the months prior to the decedent's death, she told the witnesses she was afraid of what Robert Clay, her husband, would do to her. Relying on <u>Evans-Smith v.</u> <u>Commonwealth</u>, 5 Va. App. 188, 361 S.E.2d 436 (1987), Clay's attorney objected that the statements were hearsay and immaterial and that the prejudicial effect of the statements outweighed their probative value. In response, the prosecutor argued that the testimony was admissible as "a present sense impression" and to show "motive and premeditation as well as malice." Citing <u>Compton v. Commonwealth</u>, 219 Va. 716, 250 S.E.2d 749 (1979), the prosecutor also argued that the evidence was admissible to show the "history and relationship" between the Clays. The trial judge ruled that the evidence was admissible.

For the reasons generally stated in the previous panel opinion, see <u>Clay v. Commonwealth</u>, 30 Va. App. 650, 519 S.E.2d 393 (1999), I would hold that the trial judge erred in admitting the decedent's statements in evidence. "The principal danger [of admitting this evidence] is that the jury will consider [the

-

decedent's] statement[s] of fear as somehow reflecting on [Clay's] state of mind rather than the [decedent's] - i.e., as a true indication of [Clay's] intentions, actions, or culpability."  United States v. Brown, 490 F.2d 758, 766 (D.C. Cir. 1973).  Indeed, it is precisely because of this risk of improper use that the general rule favors excluding this evidence.

> A recurring problem arises in connection with the admissibility of accusatory statements made before the act by the victims of homicide.  If the statement is merely an expression of fear - i.e., "I am afraid of D" - no hearsay problem is involved, since the statement falls within the hearsay exception for statements of mental or emotional condition.  This does not, however, resolve the question of admissibility.  The victim's emotional state must relate to some legitimate issue in the case.  For example, the victim's emotional state may permit the inference of some fact of consequence, such as lack of consent where the prosecution charges that the killing occurred during the commission of either a kidnapping or rape.

> However, the most likely inference that jurors may draw from the existence of fear, and often the only logical inference that could be drawn, is that some conduct of the defendant, probably mistreatment or threats, occurred to cause the fear.  The possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance.  Moreover, even if the judgment is made that evidence of fear standing alone should be admitted, statements of fear are rarely stated pristinely.  Instead, that state of mind usually assumes the form either of a statement by the victim that the

-

accused has made threats, from which fear
may be inferred, or perhaps more likely a
statement of fear because of the defendant's
threats.  Not only does the evidence possess
the weaknesses suggested above for
expressions of fear standing alone, but in
addition it seems unlikely that juries can
resist using the evidence for forbidden
purposes in the presence of specific
disclosure of misconduct of the defendant.

In either event, the cases have generally
excluded the evidence.  While the same
pressing need for the evidence may be
present as that which led to the development
of the hearsay exception for dying
declarations, the case for trustworthiness
is much weaker, and need alone has never
been thought sufficient to support a hearsay
exception.  Exclusion is not universal,
however, for in some circumstances
statements may be admissible under other
hearsay exceptions, such as that for
startled utterances or dying declarations.
Moreover, the decedent's fear may be
relevant for other legitimate purposes
beyond proof of the defendant's act or state
of mind.  There is broad agreement that such
statements are admissible where the defense
claims self-defense, suicide, or accidental
death, because in each of those situations
the decedent's fear helps to rebut aspects
of the asserted defense.

McCormick on Evidence § 276, at 243-45 (4th ed. 1992) (emphasis

added) (footnotes omitted).

Thus, hearsay evidence of the decedent's state of mind is

not automatically admissible simply because the defense contends

the death was an accident.  Although the decedent's hearsay

statements concerning her fear of Clay may fit within an

exception to the hearsay rule, they are only admissible if they

are relevant to some aspect of Clay's defense and their

-

prejudicial effect is outweighed by their probative value.  The

decedent's statements, which were made months before her death,

that she "was moving away" and that "she was afraid of what

might happen to her" are irrelevant to whether Clay accidentally

shot her while he was handling the gun.  Evidence of her state

of mind rebutted no aspect of Clay's defense and, when combined

with the evidence that Clay had threatened her, were highly

prejudicial.  See id.

> The threshold requirement of
> admissibility of such hearsay statements of
> fear of defendant in homicide cases is some
> substantial degree of relevance to a
> material issue in the case.  While there are
> undoubtedly a number of possible situations
> in which such statements may be relevant,
> the courts have developed three rather
> well-defined categories in which the need
> for such statements overcomes almost any
> possible prejudice.  The most common of
> these involves defendant's claim of
> self-defense as justification for the
> killing.  When such a defense is asserted, a
> defendant's assertion that the deceased
> first attacked him may be rebutted by the
> extrajudicial declarations of the victim
> that he feared the defendant, thus rendering
> it unlikely that the deceased was in fact
> the aggressor in the first instance.
> Second, where defendant seeks to defend on
> the ground that the deceased committed
> suicide, evidence that the victim had made
> statements inconsistent with a suicidal bent
> are highly relevant.  A third situation
> involves a claim of accidental death, where,
> for example, defendant's version of the
> facts is that the victim picked up
> defendant's gun and was accidentally killed
> while toying with it.  In such cases the
> deceased's statements of fear as to guns or
> of defendant himself (showing he would never
> go near defendant under any circumstances)

-

> are relevant in that they tend to rebut this
> defense.  Of course, even in these cases,
> where the evidence is of a highly
> prejudicial nature, it has been held that it
> must be excluded in spite of a significant
> degree of relevance.

Brown, 490 F.2d at 767 (emphasis added).

Relying on Compton, the Commonwealth argued that the decedent's state of mind was relevant to prove the history of Clay's relationship with the decedent.  In Compton, the accused claimed he had no reason to kill the decedent because they intended to marry.  See 219 Va. at 729, 250 S.E.2d at 757. Noting that testimony, the Court expressly detailed in the following passage, the nexus between the disputed evidence and the theory of accident:

> During the trial the defendant referred
> to the affection which he and the deceased
> had for each other, their harmonious
> relationship, and their plans to marry and
> to build a home when his divorce became
> final.  Love notes and a sentimental
> greeting card from the victim to the
> defendant were introduced by him to show
> their prior relationship and to negate any
> reason or motive that the defendant would
> have had to kill the deceased.  This
> evidence was properly admitted as bearing
> upon the motive and intent of the defendant,
> and in support of his theory that the
> killing was accidental.  For the same reason
> it was equally permissible for the
> Commonwealth to show that the relationship
> between the parties was not always an
> affectionate and calm one, but that there
> were turbulent episodes in which the conduct
> of the defendant toward the deceased was
> aggressive and threatening.

Id.

-

The record in this case contains no evidence establishing a logical nexus between the decedent's state of mind months prior to her death and Clay's state of mind when the gun fired. Clay admitted handling the gun when he and the decedent were discussing money that he believed she had taken. Clay, however, did not put at issue his personal relationship with the decedent. If Clay had put at issue the relationship between himself and the decedent, for example, by asserting that they had a loving marriage, the statements might be relevant to rebut that account of their relationship. In the context of the evidence in this case, however, decedent's statements were irrelevant to any aspect of Clay's defense. Moreover, a substantial likelihood exists that the jury used the statements to infer that Clay intentionally killed his wife.

Reversing a murder conviction where a decedent's hearsay report of threats by the defendant was admitted to disprove the defendant's claim of accidental death, the Supreme Court of California noted that in "cases involving hearsay threats, admissibility has always been approached through a careful examination of the precise issues to which the threat may be relevant." People v. Lew, 441 P.2d 942, 944 (Cal. 1968) (en banc). The Lew court examined the evidence and found no nexus between the defendant's previous threats to the decedent and the defense that the decedent accidentally killed herself while handling a gun in the defendant's presence. See id. at 943.

-

Similarly, the Oregon Court of Appeals rejected testimony of hearsay threats attributable to the defendant by the decedent and noted that "inherent in the hearsay and the [state's] argument was that the defendant had once purposefully pointed a gun at deceased; therefore, he must have been doing the same thing when she was killed." State v. Bartolon, 495 P.2d 772, 774 (Or. App. 1972). The Bartolon court held that the hearsay threats were inadmissible in the state's case-in-chief to prove the defendant's "purposefulness in pointing a firearm at his wife," where the defense was accidental shooting. Id.; see also Jones v. Commonwealth, 202 Va. 236, 242, 117 S.E.2d 67, 72 (1960) (holding that where the defendant testified his wife grabbed his hand causing the gun to discharge, evidence of hearsay threats reported by the decedent more than one month prior to the shooting was inadmissible).

Relying on Brown, the majority opinion holds that the decedent's statements of fear that Clay would harm her are "admissible under the state of mind exception to the hearsay rule to show Clay's motive and intent." In Brown, however, the court ruled only that "the state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time if that is at issue in the case." 490 F.2d at 762 (emphasis added). The Brown court held that state of mind was not at issue in that case and reversed the murder conviction. See id. at 781-82.

-

The Brown decision is consistent with the majority rule elsewhere that although hearsay evidence of a decedent's fear of a defendant legitimately can be used to prove the decedent's conduct, it is not relevant or admissible to prove the defendant's conduct. See State v. Fulminante, 975 P.2d 75, 89-90 (Ariz. 1999) (en banc); see also McCormick on Evidence § 276, at 244-45 (in certain cases hearsay can be used to prove declarant's state of mind or conduct but not the conduct of the accused). The United States Supreme Court has also noted that hearsay statements of belief or fear concerning the defendant which bear close proximity to the issue of guilt or innocence may cause substantial prejudice to the defendant's case which outweighs any probative value. See Shepard v. United States, 290 U.S. 96, 104 (1933); see also Rule 803(3), Fed.R.Evid., advisory committee's notes (recognizing that Rule 803(3) statement can prove only declarant's conduct, "not the future conduct of another person").

At Clay's trial, no act or conduct of the decedent was at issue. Thus, the decedent's state of mind had no bearing on any issue to be decided by the jury. The important fact in this case was Clay's state of mind.

> The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and, more than that, to an act by some one not the speaker. Other tendency, if it had any,

-

was a filament too fine to be disentangled by a jury.

Shepard, 290 U.S. at 106 (emphasis added).  By ruling that this evidence was admissible, the majority "reverses the effect of the statement so as to reflect on [Clay's] intent and actions rather than that state of mind of the declarant (victim)." Brown, 490 F.2d at 771.  Although the majority opinion extensively cites Brown, a close reading of Brown discloses that it logically cannot be read to support the majority's analysis. Indeed, it supports the opposite proposition.

Neither Hardy v. Commonwealth, 110 Va. 910, 67 S.E. 522 (1910), nor Hanson v. Commonwealth, 14 Va. App. 173, 416 S.E.2d 14 (1992), supports the majority's holding that the hearsay statements made by the decedent about her fears are admissible in this prosecution.  Indeed, the majority opinion's quote from Hanson was taken from the following context in Brown:

> Quite a number of courts have confronted facts similar to those here involving hearsay statements made by the victim of a homicide which inferentially implicate the defendant.  Such statements by the victims often include previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant.  While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, it is generally agreed that their admissibility must be determined by a careful balancing of their probative value against their prejudicial effect.  Courts have recognized that such statements are

-

fraught with inherent dangers and require
the imposition of rigid limitations.  The
principal danger is that the jury will
consider the victim's statement of fear as
somehow reflecting on defendant's state of
mind rather than the victim's - i.e., as a
true indication of defendant's intentions,
actions, or culpability.  Such inferences
are highly improper and where there is a
strong likelihood that they will be drawn by
the jury the danger of injurious prejudice
is particularly evident.

490 F.2d at 765-66.

I perceive no reason to characterize as dicta our statement

of the general rule in Hanson, that to be admissible in a

prosecution involving a defense of accidental death, the state

of mind of the victim must have been communicated to the

accused.[7]  See 14 Va. App. at 188, 416 S.E.2d at 23.  The

---

[7] Although the majority cites Taylor v. Commonwealth, 31 Va.
App. 54, 63 n.4, 521 S.E.2d 293, 297 n.4 (1999) (en banc), for
the proposition that justification defenses do not include
accidental death, the footnote in Taylor merely states that
"[c]laims of justification include" the listed defenses.  It
does not state that the list is exclusive rather than inclusive.
Indeed, Virginia case law suggests it is not an exclusive list.

"Ordinarily the law of self-defense is
not applicable in a case of a killing
resulting from an act which was accidental
and unintentional, particularly where the
facts of the case are not such as would make
such law applicable.  However, where the
defense of excusable homicide by
misadventure is relied on, the principles of
self-defense may be involved, not for the
purpose of establishing defense of self, but
for the purpose of determining whether
accused was or was not at the time engaged
in a lawful act; and it has been held that
in such case the right, but not the law, of

reference in Hanson to the Hardy decision was intended to support the proposition that the hearsay declarant's state of mind only could have been proved to be relevant in that case if it had been conveyed to Hanson and, additionally, would have tended to prove some fact at issue.  Indeed, we stated that "[i]n Hanson's case, Taylor's state of mind would have had significance only if the fact finder inferred that Taylor acted upon his state of mind by communicating his dissatisfaction to Hanson and that Hanson responded by killing Taylor."  Hanson, 14 Va. App. at 188, 416 S.E.2d at 23.  This is consistent with the following ruling we made in an earlier case:

> Out of court statements offered to show the state of mind of the declarant are admissible in Virginia when relevant and material.  See, e.g., Compton v. Commonwealth, 219 Va. 716, 729, 250 S.E.2d 749, 757 (1979); Jones v. Commonwealth, 217 Va. 226, 228, 228 S.E.2d 124, 126 (1976); Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 565 (1919).  [Under this rule,] . . . a statement made by a declarant [might be] admissible for the purpose of showing

> self-defense is invoked.  Accused is entitled to an acquittal where he was lawfully acting in self-defense and the death of his assailant resulted from accident or misadventure, as where in falling he struck or overturned an object and thereby received injuries resulting in his death, or where in a struggle over the possession of a weapon it was accidentally discharged."

Braxton v. Commonwealth, 195 Va. 275, 278, 77 S.E.2d 840, 841-42 (1953) (quoting Valentine v. Commonwealth, 187 Va. 946, 952, 48 S.E.2d 264, 268 (1948)) (citations omitted).

-

> the probable state of mind thereby induced in the hearer, such as being put on notice or having knowledge, or motive, or good faith of the subsequent conduct of the hearer, or anxiety, when relevant and material.

Johnson v. Commonwealth, 2 Va. App. 598, 602, 347 S.E.2d 163, 165 (1986).

For these reasons, I would hold that the trial judge erred in admitting the witnesses' testimony of the decedent's hearsay statements. Furthermore, for the reasons stated in Judge Elder's previous dissent, see Clay, 30 Va. App. at 668-670, 519 S.E.2d at 402 (Elder, J., dissenting), I would also hold that the error was not harmless.

## II.

I agree with the majority that the trial judge erred in excluding the testimony of Deputy Martin. I disagree, however, with the majority's conclusion that this error was harmless beyond a reasonable doubt.

As the majority recognizes, constitutional error is harmless "only when the reviewing court is 'able to declare a belief that it was harmless beyond a reasonable doubt.'" Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). In Virginia, a reviewing court can find a non-constitutional error harmless only if it "can conclude, without usurping the jury's fact finding function, that, had the

-

error not occurred, the verdict would have been the same." Lavinder, 12 Va. App. at 1005, 407 S.E.2d at 911. For example, where the error involves improperly admitted evidence, the error may, in some cases, be harmless when that evidence is merely cumulative of other, properly admitted evidence. See Freeman v. Commonwealth, 223 Va. 301, 316, 288 S.E.2d 461, 469 (1982). Thus, the Supreme Court has held that "[e]ven though testimony is objectionable as hearsay, its admission is harmless error when the content of the extra-judicial declaration is clearly established by other competent evidence." Schindel v. Commonwealth, 219 Va. 814, 817, 252 S.E.2d 302, 304 (1979).

The erroneous exclusion of evidence, however, raises different concerns. If the fact sought to be proved by that evidence is established by other, properly admitted evidence, the probative value of or the weight the jury might have given the improperly excluded evidence may be qualitatively more significant than the evidence that was admitted. Thus, we have said that the admission of "[o]ther evidence of a disputed fact standing alone, does not establish that an error is harmless." Hooker v. Commonwealth, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992). A harmless error analysis is not simply a sufficiency of the evidence analysis. See id. Even if "the other evidence amply supports the jury's verdicts, [the error is not harmless when] the disputed testimony may well have affected

-

the jury's decision."  Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978).

I would hold that the erroneous exclusion of Deputy Martin's testimony regarding Clay's demeanor and willingness to cooperate after the shooting was not harmless error.  As Clay proffered at trial, Martin's testimony was not merely cumulative of Lieutenant Powell's testimony.  As the majority notes, Powell's testimony established that Clay sought out police to admit shooting his wife and that he was visibly shaken and upset.  Powell's testimony, however, which, including cross-examination, spans only four pages in the transcript, indicates that Powell's contact with Clay was limited to the time of Clay's initial arrival at the police station.  Clay told Powell he had shot his wife in their home and did not know whether she was still alive.  After Clay gave Powell a key to his house, Powell asked the dispatcher to call the rescue squad and "[got] somebody to sit with [Clay] while [Powell] went out to [Clay's] house."  Powell related no further contact with Clay.  Martin's testimony would have established that Clay remained in Martin's company for more than "thirty minutes to an hour," during which time he remained somber, quiet, and cooperative.  He did not invoke his right to silence or counsel and gave a lengthy statement regarding the shooting.  Clearly, Martin's testimony would have given the jury a fuller picture of

-

Clay's demeanor immediately after the incident and was not simply cumulative of Powell's testimony.

The jury convicted Clay of second degree murder, which required a finding that Clay acted with malice in shooting his wife. Deputy Martin's testimony concerning appellant's demeanor and continued cooperation might have lended credibility to Clay's testimony that the shooting was an accident. Thus, the erroneously excluded evidence might have provided a significant foundation for the jury to find the evidence at most proved the lesser offense of involuntary manslaughter. Although the evidence, including Deputy Martin's testimony, was sufficient to support a conviction for second degree murder, I do not believe we can conclude beyond a reasonable doubt, without usurping the jury's fact finding function, that the error of excluding Martin's testimony did not affect the verdict.

For these reasons, I would reverse the convictions and remand for a new trial.